JILEK v STOCKSON

Docket No. 289488. Submitted April 13, 2010, at Detroit. Decided July 29, 2010, at 9:00 a.m.

Joy A. Jilek, as personal representative of the estate of Daniel D. Jilek, deceased, brought a medical-malpractice action in the Washtenaw Circuit Court against board-certified family-medicine physician Carlin C. Stockson, M.D., EPMG of Michigan, P.C., which was Stockson's employer, Trinity Health-Michigan, and others, relating to Stockson's treatment of Daniel at an urgent-care center. Plaintiff filed two affidavits of merit, both of which asserted that the applicable standard of care was that of a board-certified emergency-medicine physician. In their answer to plaintiff's complaint, Stockson and EPMG denied that Stockson was practicing as an emergency-medicine physician and submitted an affidavit of meritorious defense that referred to the standard of care applicable to a family-medicine physician. Following a motion by plaintiff, the court, David S. Swartz, J., ruled that plaintiff's affidavits were adequate. Shortly before trial, Trinity Health-Michigan moved to bar one of plaintiff's experts, a board-certified emergency-medicine physician, from testifying, arguing that the standard of care was that applicable to a family-medicine physician, not an emergency-medicine physician. The court disagreed and denied the motion. Trinity Health and another defendant filed an emergency application for interlocutory leave to appeal, which the Court of Appeals denied in an unpublished order, entered August 1, 2008 (Docket No. 286780). At trial, defense counsel contended that the issue of what specialty governed the standard of care remained unresolved. The trial court allowed the parties to present expert testimony to the jury concerning their views of the relevant specialty and standard of care. When instructing the jury at the close of proofs, the trial court stated that the applicable standard of care was that of a physician specializing in family practice and working in an urgent-care center. The jury returned a verdict of no cause of action in favor of Stockson and EPMG. Plaintiff appealed.

The Court of Appeals *held*:

1. The trial court erred by instructing the jury that the standard of care was that of a family-medicine physician working in an urgent-care setting. The applicable standard of care under

MCL 600.2169(1)(a) is that of the one most relevant medical specialty. The record in this case established that the most relevant medical specialty was emergency medicine. Although Stockson was board-certified in family practice, the specialty she was engaged in during the course of the alleged malpractice was emergency medicine.

2. Even if the trial court's jury instruction on the applicable standard of care had been correct, reversal would be necessary in this case. The proper standard of care is a matter of law and must be determined before trial so that objections to expert witnesses can be made and the parties can appropriately argue their proofs under a single standard of care. The court's earlier rulings in this case led plaintiff to believe that the standard of care was that applicable to emergency-medicine physicians. By either changing the applicable standard of care at the end of the trial or withholding a decision on the applicable standard of care until the end of the trial, the court seriously prejudiced plaintiff.

3. The trial court erred by excluding several practice guidelines that plaintiff proffered as relevant to the standard of care. Although practice guidelines, such as EPMG's chest-pain guideline, may not be used to establish the standard of care, they are admissible when they are relevant to the standard of care at issue and to the injury alleged.

Reversed and remanded for a new trial.

BANDSTRA, P.J., dissenting, stated that because Stockson was board-certified in family medicine, Stockson and EPMG were properly permitted to present expert testimony by board-certified family-medicine specialists under MCL 600.2169 and the trial court properly instructed the jury that the applicable standard of care was that of a physician specializing in family practice. Plaintiff benefitted to the extent that the jury was permitted to hear testimony from plaintiff's emergency-medicine experts. The trial court also properly excluded the practice guidelines proffered by plaintiff, which were inadmissible under controlling precedent. Even if the majority correctly identified any trial errors, those errors did not result in a jury verdict that was inconsistent with substantial justice. Accordingly, the verdict should have been affirmed.

1. NEGLIGENCE — MEDICAL MALPRACTICE — STANDARD OF CARE — PHYSICIANS — SPECIALISTS — BOARD-CERTIFIED PHYSICIANS.

The applicable standard of care in a medical-malpractice action against a board-certified physician is the one most relevant standard of practice or care, i.e., that standard of practice or care applicable to the specialty engaged in by the physician during the

course of the alleged malpractice; the proper standard of care is a matter of law and must be determined before trial (MCL 600.2169[1][a]).

2. NEGLIGENCE — MEDICAL MALPRACTICE — STANDARD OF CARE — EVIDENCE — PRACTICE GUIDELINES FOR MEDICAL CARE.

   Practice guidelines, policies, and procedures adopted or used by medical providers do not establish the standard of care at issue in a medical-practice action, but they are admissible when they are relevant to the standard of care and to the injury alleged.

*Mark Granzotto, P.C.* (by *Mark Granzotto*), and *Davis & Kuhnke, P.C.* (by *Peter A. Davis* and *Carol A. Kuhnke*), for Joy A. Jilek.

*Collins, Einhorn, Farrell & Ulanoff, P.C.* (by *Noreen L. Slank*), for Carlin C. Stockson and EPMG of Michigan, P.C.

Before: BANDSTRA, P.J., and BORRELLO and SHAPIRO, JJ.

SHAPIRO, J. Plaintiff brought a wrongful-death suit against Dr. Carlin Stockson and her employer/principal EPMG of Michigan, P.C.[1] Plaintiff alleged that Dr. Stockson was negligent in her evaluation, diagnosis, and treatment of Daniel Jilek when she saw Jilek at the Maple Urgent Care center on March 1, 2002.[2] The jury returned a verdict of no cause of action in favor of Dr. Stockson and EPMG.

For reasons the record does not explain, Jilek went for treatment at Maple Urgent Care on March 1, 2002, rather than to his primary doctor. According to the

---

[1] EPMG stands for Emergency Physicians Medical Group.

[2] Plaintiff also initially named Jilek's family doctor as well as Trinity Health-Michigan, the entity that operates the urgent-care center. Each was dismissed before judgment, and they are not parties to this appeal. However, certain actions by Trinity Health before the dismissal remain relevant to the procedural posture of the case.

front desk form he completed, Jilek was complaining of "continued sinus/respiratory congestion." The triage nurse documented a statement by Jilek that he had had head and chest congestion for several months and, though a course of antibiotics in December had resulted in some improvement, he was not completely better. Jilek's blood pressure was elevated at triage. He was seen by Dr. Stockson, who, in addition to the complaints recorded at triage, noted "chest tightness" and "trouble breathing" that were "[i]nterfering with [his] ability to run." Dr. Stockson also noted that Jilek was in "moderate" distress. Plaintiff asserted that Dr. Stockson failed to adhere to the standard of care for emergency medicine, which plaintiff asserted required Dr. Stockson to further investigate the symptoms reported to her by Jilek by taking a more detailed history, taking an electrocardiogram (ECG), and referring Jilek for additional outpatient care by a cardiologist. Plaintiff further asserted that if Jilek's ECG had not been normal or he had active chest tightness at the time of the examination, he should have been immediately transferred to the emergency department at the hospital for further testing before discharge. Plaintiff further claimed that until any suspicion of cardiac involvement was appropriately ruled out, the standard of care required Dr. Stockson not to prescribe albuterol and to instruct Jilek to refrain from exercise.

Jilek died while exercising after albuterol use, five days after his visit to Maple Urgent Care. The autopsy revealed that Jilek had significant coronary-artery disease in his left anterior descending coronary artery and that he died as a result of a heart attack caused by an acute blood clot in that vessel, which formed in the hours before his death. Plaintiff asserted that had Dr. Stockson acted within the standard of care, Jilek's cardiac disease would have been discovered and timely

treated or she would not have prescribed what plaintiff asserted was a contraindicated medication that precipitated the heart attack.

There are three issues on appeal. First, plaintiff asserts that the trial court erred by allowing the jury to hear evidence on the standard of care applicable to inapplicable specialties, incorrectly instructing the jury on the applicable specialty, and failing to make a clear pretrial ruling on the applicable specialty. Second, plaintiff asserts that the trial court improperly excluded evidence of practice guidelines issued by the American College of Emergency Physicians, as well as policies, procedures and guidelines used in the operation of the urgent-care center. Third, plaintiff argues that the trial court should have barred defendants'[3] experts from testifying in light of defendants' failure to answer expert witness interrogatories. We agree with plaintiff on the first two claims and, accordingly, reverse and remand for a new trial. In light of our resolution of the first two issues, we need not address the third.

### I. STANDARD OF CARE

We find error requiring reversal in the trial court's instruction regarding the applicable standard of care. We also find error requiring reversal in the manner by which the trial court determined the standard of care. With regard to the former, we conclude that the hybrid standard of care fashioned by the trial court did not comply with *Woodard v Custer*, 476 Mich 545, 560, 566; 719 NW2d 842 (2006), and that the trial court erred by not determining what single recognized medical specialty constituted "the one most relevant specialty,"

---

[3] Unless otherwise specified, the use of the term "defendants" throughout this opinion refers to appellees Dr. Stockson and EPMG.

which in this case was emergency medicine. With regard to the latter, we conclude that the trial court erred by allowing experts in varying specialties to testify at trial about their differing views of what medical specialty was being practiced at the time of the alleged malpractice despite the fact that only testimony by experts specializing in emergency medicine should have been admitted.

The proper standard of care for purposes of MCL 600.2169(1)(a) is determined as a matter of law. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 16 n 16; 651 NW2d 356 (2002) (stating that this Court "erred in holding that the standard of care was an evidentiary matter reviewed for an abuse of discretion"). Accordingly, as a question of law, we review this issue de novo. *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008).

Plaintiff's complaint alleged that Dr. Stockson "breached the standard of practice or care in emergency medicine . . . ." Plaintiff filed two affidavits of merit. Each asserted that the standard of care that applied to Dr. Stockson was "that of a physician who is board certified in emergency medicine." One of the affidavits further explained that "[w]hile Dr. Stockson was board certified in family practice medicine, she was practicing emergency medicine, and therefore, subject to the standard of care in emergency medicine." One of these affidavits was signed by Dr. Michael Sama, a board-certified emergency-medicine physician. The other was signed by Dr. Richard Birrer, who is board-certified in both emergency medicine and family practice.

Defendants' answer denied that Dr. Stockson was practicing as an emergency-medicine physician, but did not specify what standard of care applied other than an undefined reference to "the standard of practice of [her]

profession . . . ." The affidavit of meritorious defense filed by Dr. Stockson and EPMG was signed by a board-certified family practice doctor and referred to "[t]he standard of care applicable to a physician practicing family medicine . . . ."

Defendants filed affirmative defenses, including one asserting that plaintiff's affidavits of merit did not comply with statutory requirements, and asserted that "[d]efendants intend to file a Motion for Summary Disposition upon this ground in the near future." However, defendants did not file such a motion. Plaintiff served affirmative-defense interrogatories asking for the basis of this affirmative defense, i.e., asking in what way the affidavits had been noncompliant. Defendants did not answer this interrogatory. Therefore, in March 2006, plaintiff filed a motion asking the trial court to determine the validity of the affidavits of merit and to strike defendants' affirmative defense. Plaintiff's motion noted that the apparent basis of the affirmative defense lay in the question of whether the standard of care was that of emergency medicine or family practice. Plaintiff further noted that if the affidavits were in fact defective, then plaintiff would have to take curative action and that plaintiff did not wish to allow defendants to prejudice her claim by withholding information regarding the alleged defect until the period of limitations had run. Plaintiff's brief stated:

> [I]n the absence of any substantive or well-founded objection to the affidavits, and because time is ticking on the statute of limitations and statute of repose, plaintiff must ask that the court review these issues now, while there is time to cure any defect should the court agree with defendants.

Defendants' response to the motion continued their effort to preserve a right to object to plaintiff's affida-

vits, but withhold the basis of that objection until the period of limitations had run. Indeed, the response did not assert any defect in the affidavits whatsoever nor assert that plaintiff's experts were not qualified by reason of being in the wrong specialty. Defendants mysteriously asserted only that "the adequacy of Plaintiff's experts and therefore the adequacy of their Affidavit is subject to question" and sought to delay a determination concerning that adequacy.[4] The trial court, after hearing arguments, granted plaintiff's motion, holding that "plaintiff's affidavits of merit are adequate and in compliance with the relevant court rules and statutes, and as such . . . defendants' [sic] Stockson and EPMG's affirmative defenses nos. 5 and 15 are hereby dismissed with prejudice." The trial court also directed defendants to answer plaintiff's outstanding interrogatories regarding affirmative defenses.

More than two years later and less than one month from trial, nonappellee defendant Trinity Health-Michigan moved to exclude plaintiff's emergency-medicine expert, Dr. Sama, from testifying on the grounds that the applicable standard of care was family practice, not emergency medicine.[5] Plaintiff's counsel argued that the standard of care was emergency medicine and that

---

[4] The practice of challenging affidavits of merit and notices of intent only after it is too late to cure the alleged defect, commonly known as "sandbagging," while tempting to the practitioner seeking to prevail for his or her client does little for the reputation of the courts as a place where substantive justice occurs. Given our Supreme Court's recent decisions in *DeCosta v Gossage*, 486 Mich 116, 118-119; 782 NW2d 734 (2010), *Potter v McLeary*, 484 Mich 397, 406; 774 NW2d 1 (2009), and *Bush v Shabahang*, 484 Mich 156, 161; 772 NW2d 272 (2009), the efficacy of such gamesmanship appears to have been greatly reduced, if not eliminated.

[5] Plaintiff's other standard-of-care expert was board-certified in both emergency medicine and family practice. However, like Dr. Sama, he had opined in his affidavit and deposition that the relevant specialty was emergency medicine.

Dr. Sama was therefore properly qualified. At the conclusion of the argument, the trial court stated, "The Court agrees with the plaintiff. Motion denied."[6]

Trinity Health requested a stay of the proceedings on the eve of trial while it sought to appeal the trial court's ruling allowing plaintiff's experts to testify. The trial court denied the motion, citing prejudice to plaintiff and because the court had "determined that defendants' claims of error are without merit . . . ."[7] On the morning of trial, plaintiff and Trinity Health placed a settlement on the record, and Trinity Health was dismissed from the case.

Despite the trial court's ruling two years earlier finding adequate an affidavit of merit that used an

---

[6] Trinity Health filed a motion for reconsideration of the trial court's order denying its motion to exclude Dr. Sama's testimony. The motion for reconsideration offered a different analysis than did the original motion. The original motion argued that Dr. Sama could not testify because the applicable standard of care was family practice and he was not a family practitioner. The motion for reconsideration asserted for the first time that urgent-care medicine is a distinct specialty. The reconsideration motion asked the court to consider materials attached to the motion purporting to demonstrate the existence of an entity called the "American Board of Urgent Care Medicine" as well as two other entities purporting to be accrediting boards of urgent-care medicine. Under the court rules, no response to the motion for reconsideration could be filed and no hearing was held. The record received by this Court does not contain any order granting or denying the motion for reconsideration. However, at a July 30, 2008, hearing on other motions, the trial court stated, without further explanation, that it had reviewed the motion for reconsideration and that it was denied. Defendants, unlike Trinity Health, have never argued either below or on appeal that there is a separate specialty board in urgent-care medicine. The possible existence of such a specialty is further discussed in n 10 of this opinion.

[7] Six days later, the nonappellee defendants filed an emergency application for leave to appeal in this Court, asking for a determination whether the trial court erred by allowing plaintiff's emergency-medicine experts to testify. This Court denied the application "for failure to persuade the Court of the need for immediate appellate review." *Jilek v Trinity Health-Mich*, unpublished order of the Court of Appeals, entered August 1, 2008 (Docket No. 286780).

emergency-medicine standard of care and the trial court's
denial just a few weeks before trial of Trinity Health's
motion to bar Dr. Sama from testifying, defendants' coun-
sel took the position at trial that the issue of what
specialty governed the standard of care was still an
unresolved question. Its prior rulings notwithstanding,
the trial court allowed each party to argue its own view of
the relevant specialty and present standard-of-care ex-
perts from those varying specialties. During trial, defense
counsel interrupted the testimony of plaintiff's experts
with objections, asserting, in the presence of the jury, that
plaintiff's experts were opining on the basis of emergency-
medicine standards and that emergency-medicine stan-
dards were wholly irrelevant. The trial court did not rule
on these objections, instead stating that it was taking
them under advisement.

Not surprisingly, the issue came to a head when, at the
end of proofs, the attorneys and the trial court were
discussing jury instructions. Plaintiff argued that the trial
court's denial of defendants' pretrial motion to strike the
experts' testimony necessarily implied a finding by the
court that the relevant specialty was emergency medicine.
Defendants argued that the pretrial ruling merely allowed
plaintiff to have its emergency-medicine experts testify
and left open the question of the applicable specialty for
the standard of care. In response to these arguments, the
trial court stated:

> I have no problem with allowing emergency room phy-
> sicians to testify to the standard of care in this case . . . . I
> don't think it's a problem. I think it's appropriate.
>
> But what we have is we have Doctor Stockson. She is a
> family practitioner, board certified practicing in an urgent
> care setting. That's what she's going to be evaluated at.

The trial court then instructed the jury that the
applicable standard of care was that of "a physician

specializing in family practice and working in an urgent care center . . . ." This instruction plainly runs afoul of the principles governing standards of care set forth in *Woodard*, 476 Mich at 560. In *Woodard*, the Supreme Court foreclosed the notion of multiple or hybrid standards of care and instead made clear that the sole standard to be applied is that flowing from the one most applicable medical specialty. *Id*. Specifically, the *Woodard* Court held that expert witnesses must "match the one most relevant standard of practice or care—the specialty engaged in by the defendant physician during the course of the alleged malpractice . . . ." *Id*. The Court went on to define "specialty" as "a particular branch of medicine or surgery in which one can potentially become board certified." *Id*. at 561. As there is no board certification titled "family practice in an urgent-care center," this cannot be considered a specialty defining the most relevant standard of care, let alone the "one most relevant" standard.

Defendants argued that the relevant standard of care is controlled by the fact that Dr. Stockson is a board-certified family practitioner. However, Dr. Stockson's residency and board certification as a family practitioner would not be relevant to the standard of care if the locus or substance of the medicine she was practicing at the time of the alleged malpractice defined a different specialty. This issue was resolved in *Reeves v Carson City Hosp (On Remand)*, 274 Mich App 622, 630; 736 NW2d 284 (2007), in which this Court concluded that a physician, board-certified in family practice but practicing in the emergency room, was held to the emergency-medicine standard, not a family-practice one.[8]

---

[8] This was again confirmed in *Gonzalez v St John Hosp & Med Ctr*, 275 Mich App 290; 739 NW2d 392 (2007), in which we held that a resident is

A review of the record reveals overwhelming support for the conclusion that the controlling standard in this case is that of emergency medicine, not family practice. On the website for St. Joseph Mercy Hospital (SJMH), the hospital affiliated with Maple Urgent Care, Dr. Stockson's medical specialty was listed as emergency medicine. She was not listed in the hospital's listing of urgent-care physicians or family-medicine physicians. Her office was located with the Emergency Physicians Medical Group, and she was listed as a member of the emergency department of the hospital. Her position description indicated that she had primary responsibility for day-to-day management of the emergency department. She signed facility policy statements for Maple Urgent Care that were titled "Emergency Services Guideline[s]."[9] Moreover, the hospital represented that its urgent-care facilities were routinely staffed by physicians and nurses who were "trained to handle emergency cases." Dr. Stockson's report on Jilek's visit was designated as an "EMERGENCY PHYSICIAN RECORD," and she signed his discharge instructions as the "Emergency Physician." Dr. Stockson testified at her deposition that urgent care is not part of the family-practice department and that she reported to the chair of the emergency-medicine department, and defendants admitted that urgent care was under the emergency-services division of the hospital. There was

held to the standard of the specialty he or she is practicing in even though the resident is not yet a specialist in any field.

[9] Dr. Stockson argues that these are representations of the hospital and that she did not request that she be so listed in the hospital's materials and did not print the guidelines. However, we do not rely on these listings and items as admissions by Dr. Stockson. Rather, we view them as a description of how the hospital and medical profession defined the specialty of Dr. Stockson. We are unaware of any evidence in this case that the hospital believed it erred in the manner in which it listed her or its guidelines.

also evidence that the parking lot at the urgent-care location had parking spaces designated by signs for emergency patients despite the fact that there was no adjacent or nearby facility called an emergency room. Accordingly, the evidence in the record indicates that, regardless of Dr. Stockson's family-medicine board certification and her ineligibility to be board-certified in emergency medicine, the specialty she was engaged in during the course of the alleged malpractice was emergency medicine. See *Woodard*, 476 Mich at 560.

We also consider the nature of the term "urgent care" itself. The word "urgent" is defined in various dictionaries as "[c]ompelling immediate action; pressing," *American Heritage Dictionary* (2007); "[d]emanding immediate attention," *Webster's New Basic Dictionary* (2007); and "calling for immediate attention," Merriam-Webster <http://www.merriam-webster.com/dictionary/urgent> (accessed July 28, 2010). These terms are far more consistent with the scope of emergency medicine than they are with the scope of family practice.

Defendants maintain that urgent-care centers also serve as substitute primary caregivers for patients seeking episodic rather than continuous care. This may be true. However, defendants concede that this is also true of hospital emergency rooms, but it does not allow family practitioners practicing in an emergency room to avoid the emergency-medicine standards. Indeed, in the instant case, Jilek had a primary-care doctor but, for some reason, elected to go instead to an urgent-care facility on the day in question. As a matter of law, the proper standard of care was that for emergency-medicine specialists.[10]

---

[10] While we conclude that emergency medicine is "the one most relevant specialty" in this case, and is the standard to be applied at

Moreover, even if the trial court's standard-of-care instruction had been substantively correct, we would nevertheless find it necessary to reverse and order a new trial in this case. As set forth previously, plaintiff had every reason to believe that the trial court had concluded that the standard of care was that of emergency medicine. By approving the affidavits of merit, the trial court implicitly made a determination of the relevant standard of care.[11] This was confirmed only a few weeks before trial when the court ruled that Dr. Sama, an emergency-medicine expert, could testify about the standard of care. Given that standard-of-care testimony may only be given by experts in the relevant specialty, this ruling necessarily rejected defendants' argument that the proper standard of care was for a family-practice physician in an urgent-care setting and adopted plaintiff's argument that the applicable standard of care was that

retrial, we do not foreclose the possibility that in a different case, given appropriate evidence and findings, a trial court could conclude that there is a specialty of "urgent-care medicine" and that it is the one most relevant specialty. We note that in its motion for reconsideration in the trial court, Trinity Health submitted documentation that there is a board certification in a specialty called urgent-care medicine. The motion did not assert, however, that this is a specialty or subspecialty recognized by the American Board of Medical Specialties and so, on this record, we cannot determine whether the organization referred to is " 'an officially recognized and legally constituted body . . . .' " *Woodard*, 476 Mich at 564. In any event, defendants did not make that argument in either the trial court or this Court. In fact, they have consistently stated their position that "[Dr. Stockson] cannot be regarded as a 'specialist' in urgent care, because urgent care is not a board certified practice . . . ." Further, neither of defendants' experts would have qualified as an expert in urgent care since each conceded that less than 50 percent of his professional time in the year before the case arose was spent in an urgent-care facility.

[11] An affidavit of merit may satisfy the statute even when signed by an unqualified expert if the attorney "reasonably believes" that the expert meets the testimonial requirements. MCL 600.2912d(1). However, the issue of reasonable belief was never raised by either party to the motion concerning the affidavits of merit and played no role in the ruling.

of emergency medicine. Thus, even assuming that the trial court's hybrid standard of care could have been appropriate, the fact that the trial court *changed* the standard of care *at the end of trial* created serious prejudice to plaintiff.

The proper standard of care is a matter of law. *Cox*, 467 Mich at 16 n 16. The applicable specialty must be determined before trial so that objections to expert witnesses can be made and the parties can appropriately argue their proofs under a single standard of care. It is highly confusing to juries, and prejudicial to the parties, to permit argument throughout trial about what specialty was being practiced. Waiting until the end of trial to determine the applicable standard of care results in the jury hearing standard-of-care evidence from experts who are not qualified to so testify. The trial court erred as a matter of law by either changing its pretrial ruling that the emergency-medicine standard applied or, alternatively, by withholding a final decision on the relevant standard until the close of proofs and permitting experts advocating dueling standards of care to testify to the jury.

Accordingly, we reverse the trial court's decisions to permit the jury to hear evidence concerning the standard of care for family-practice physicians and to instruct the jury that the applicable standard of care was that of a family-practice physician working in an urgent-care center. We remand for a new trial. The governing standard of care to be employed at the new trial is that of emergency medicine. The parties shall be granted reasonable time to amend their expert witness lists and for any additional necessary expert witness discovery.

## II. ADMISSION OF GUIDELINES

Because we are remanding for a new trial, we must address the admissibility of the guidelines proffered by

plaintiff. Previously, the trial court excluded several practice guidelines that plaintiff wished to admit as relevant to the standard of care. These included internal guidelines and policies adopted by EPMG, SJMH, and Maple Urgent Care. We conclude that to the degree these documents are relevant and are not otherwise infirm under the rules of evidence, they are admissible. We specifically reject defendants' reading of *Gallagher v Detroit-Macomb Hosp Ass'n*, 171 Mich App 761; 431 NW2d 90 (1988), so as to bar the admission of all internal guidelines in medical malpractice cases. We also conclude that the trial court erred by excluding practice guidelines promulgated by the American College of Emergency Physicians.

We begin our analysis by noting that no statute bars the admission of such guidelines, and we do not find any legislative enactment of a privilege that would do so. By contrast, the Legislature has created a statutory privilege regarding peer-review investigations in MCL 333.20175(8). The Legislature has also established statutory privileges with respect to probation reports, MCL 791.229; accountant-client communications, MCL 339.732; penitent-clergy communications, MCL 600.2156; spousal testimony and communications, MCL 600.2162; journalistic sources, MCL 767.5a; physician-patient communications, MCL 600.2157; psychologist-patient communications, MCL 333.18237; social worker-client communications, MCL 333.18513; and student records and communications, MCL 600.2165; among others. However, it has not created such a privilege with respect to the guidelines or policies of medical providers in place at the time a case arises.

In the absence of legislative support, defendants rely on this Court's opinion in *Gallagher*. However, defendants ignore *Gallagher*'s recognition that "a hospital's

rules could be admissible as reflecting the community's standard where they were adopted by the relevant medical staff and where there is a causal relationship between the violation of the rule and the injury." *Id.* at 767.[12] This principle clearly applies in this case and should be the standard by which admission of internal policies, guidelines, and procedures are governed in medical malpractice cases.

Focusing the inquiry on relevancy is also consistent with the cases on which *Gallagher* relied. The internal policies were excluded in those cases because the plaintiffs asserted that those policies defined the duty or even created a duty beyond that set by law. By contrast, plaintiff in this case does not argue that the policies themselves set or defined the standard of care, only that they may be considered relevant to the jury's determination, in light of the expert testimony, of what that standard was. In *Dixon v Grand Trunk W R Co*, 155 Mich 169, 173; 118 NW 946 (1908), our Supreme Court held that the railroad company's internal rules regarding keeping switches locked "do not *fix* the obligations and liability of the defendant . . . ." (Emphasis added.) Indeed, in *Dixon*, the plaintiff specifically alleged that the defendant was liable *solely* because its employees violated the company's internal regulation, and the plaintiff sought to have the jury form ask: " 'Was defendant negligent in failing to enforce its rule to lock switches?' " *Id.* at 174.

*McKernan v Detroit Citizens' Street-Railway Co*, 138 Mich 519; 101 NW 812 (1904), concerned the speed of

---

[12] We reject defendants' suggestion that this statement was without purpose and that we should conclude that *Gallagher* adopted an absolute bar to admission of these materials despite their relevancy to the standard of care and causation. Moreover, to the degree defendants argue that their view of *Gallagher* is accurate and that we must adhere to it, we note that *Gallagher* was decided in 1988 and we are not bound to follow it under MCR 7.215(J)(1).

operation of a trolley as it passed a firehouse. The statutory speed limit was 20 miles an hour, but the trolley company had an internal rule that the trolley's speed when passing a firehouse should not exceed 4 miles an hour. *Id.* at 523. The trial court excluded this rule from evidence. The Supreme Court noted briefly that the trolley company's rule did not "add to the defendant's obligations to the public . . . ." *Id.* at 524. The issue was further discussed in Justice HOOKER's concurrence, in which he explained that internal rules do not "make a new . . . standard of care, from which the railroad cannot safely depart." *Id.* at 527 (HOOKER, J., concurring). He went on to say that an internal rule might constitute some evidence tending to show negligence, but the failure to observe the rule was not negligence per se. *Id.* at 528. Finally, *Wilson v W A Foote Mem Hosp*, 91 Mich App 90, 95; 284 NW2d 126 (1979), like *Dixon*, held that internal rules "do not *fix* the applicable standard of care" and "do not *establish* the applicable standard of care." (Emphasis added.)[13]

Consistent with these cases, plaintiff does not assert that the standard of care is "fixed" or "established" by

---

[13] Defendants also refer us to two post-*Gallagher* cases: *Buczkowski v McKay*, 441 Mich 96; 490 NW2d 330 (1992), and *Zdrojewski v Murphy*, 254 Mich App 50; 657 NW2d 721 (2002). *Buczkowski* involved a suit brought by a man injured by shotgun ammunition fired by Walter McKay. The plaintiff alleged that defendant, Kmart, sold ammunition to McKay while he was intoxicated. *Buczkowski*, 441 Mich at 97-98. McKay fired the shotgun hours later and miles away, and the plaintiff was hit by a ricochet while he was in his backyard. *Id.* at 98-99. The Supreme Court concluded that a firearms merchant had no duty to third persons injured by the firearm even if the purchaser was intoxicated. *Id.* at 100. Since the Court found no duty as a matter of law, it did not have to determine whether the jury could consider Kmart's internal rules to determine whether Kmart had acted negligently. *Zdrojewski* is also inapplicable because the only rules at issue were external rules established by the Joint Commission on Accreditation of Healthcare Organizations and the Court found that they were admissible. *Zdrojewski*, 254 Mich App at 62-63.

internal policies or guidelines. Defendants suggest that, as a matter of public policy, all such policies should be excluded, even if relevant, so as to avoid discouraging their creation. Such an argument is better made to the Legislature, which, if it wishes, can adopt such a privilege. Moreover, we find no reference in any of the cases we have reviewed, the record, or defendants' briefs to any empirical data that supports the speculative conclusion that medical providers will choose not to define procedures and guidelines for their employees if it is possible that those procedures may at some point be considered as relevant, but not controlling, evidence in a legal matter.

We also consider the opinions of sister jurisdictions. Nearly all of the states that have published law on the subject appear to follow the rule that internal policies may be introduced as relevant to the standard of care but, standing alone, do not fix or establish that standard. See *Taylor v Lakeside Behavioral Health Sys*, opinion of the Tennessee Court of Appeals, issued March 15, 2010 (Docket No. W2009-00914-COA-R3-CV); *Stone v Proctor*, 259 NC 633; 131 SE2d 297 (1963); *Foley v Bishop Clarkson Mem Hosp*, 185 Neb 89; 173 NW2d 881 (1970); *Boland v Garber*, 257 NW2d 384 (Minn, 1977); *Williams v St Claire Med Ctr*, 657 SW2d 590 (Ky App, 1983); *Van Steensburg v Lawrence & Mem Hosps*, 194 Conn 500; 481 A2d 750 (1984); *Happersett v Bird*, unpublished opinion of the Wisconsin Court of Appeals, issued October 22, 1998 (Docket No. 97-3726);[14] *Wuest ex rel Carver v McKennan Hosp*, 2000 SD 151; 619 NW2d 682 (2000); *Moyer v Reynolds*, 780 So 2d 205 (Fla App, 2001); *Reed v Granbury Hosp Corp*, 117 SW3d 404 (Tex App, 2003); *Luettke v St Vincent Mercy Med Ctr*, unpublished opinion of the Ohio Court of

---

[14] 222 Wis 2d 624; 587 NW2d 457 (Table).

Appeals, issued July 28, 2006 (Docket No. L-05-1190); *Riverside Hosp, Inc v Johnson*, 272 Va 518; 636 SE2d 416 (2006); *Jones v Nat'l Railroad Passenger Corp*, 942 A2d 1103 (DC App, 2008); *Peterson v Nat'l Railroad Passenger Corp*, 365 SC 391; 618 SE2d 903 (2005); *Unger v Allen*, 3 Pa D & C 5th 191 (PA Com Pl, 2006); *Caldwell v K-Mart Corp*, 306 SC 27; 410 SE2d 21 (SC App, 1991); *Adams v Family Planning Assoc Med Group, Inc*, 315 Ill App 3d 533; 733 NE2d 766 (2000). But see *Monroe v Brown*, unpublished opinion of the Alaska Supreme Court, issued February 20, 1991 (Docket No. S-3326).

Having recognized that the question is one of relevancy, we turn to the specific documents excluded by the trial court. We conclude that several of them should have been admitted and that several were properly excluded. We will first review those documents that were improperly excluded and then those that were properly excluded.

Plaintiff's proposed exhibit 27, "Process for Transferring Urgent Care Patients With Chest Pain to the SJMH [Chest Pain Center]," was admissible, and the trial court erred by excluding it. That policy provides, "Adult patient with chest pain arrives at Urgent Care; vital signs and ECG obtained." This could be interpreted several different ways. First, it could be read as indicating that all adult patients with chest pain arriving at the urgent-care center must have their vitals taken and receive an ECG, in which case it was admissible to support plaintiff's claim that the standard of care required that all patients complaining of chest pain (including chest tightness) should be given an ECG. It could also be interpreted as indicating that only those adult patients who presented at the urgent-care center, had their vitals taken, and received an ECG would be

evaluated for transfer, in which case it was inapplicable here because Jilek did not receive an ECG. Because the document can be reasonably interpreted in a fashion that is applicable to the instant case, its admissibility would turn on the manner in which the parties' experts viewed it in light of the applicable standard of care.

Similarly, the trial court erred by excluding plaintiff's proposed exhibit 23, the American College of Emergency Physicians' "Clinical Policy for the Initial Approach to Adults Presenting with a Chief Complaint of Chest Pain, With No History of Trauma." Such external guidelines have been previously found to be admissible. *Zdrojewski*, 254 Mich App at 62-63. In addition, since this policy was specifically adopted by SJMH for use in its emergency department and urgent-care centers, including Maple Urgent Care, at the time that Dr. Stockson treated Jilek, it as also admissible under *Owens v Allis-Chalmers Corp*, 414 Mich 413, 422-423; 326 NW2d 372 (1982), and *Gallagher*, 171 Mich App at 767.[15]

Plaintiff's proposed exhibit 24, an internal EPMG document entitled "Introduction to EPMG's Chest Pain

---

[15] Defendants characterize the American College Emergency Physicians' policy as relating to patients presenting with *primary* complaints of chest pain or respiratory difficulty. In fact, only one of the guidelines provides that the "chief complaint" must be chest pain. The other guidelines only state that the patient must complain of chest pain and provide no requirement that it be the "primary" complaint. Moreover, although the title indicates that it is related to those with a "chief complaint," the policy itself provides:

Published studies report that up to 7% of visits to the [emergency department] involve complaints regarding chest pain. The complaint of chest pain encompasses a wide variety of conditions that range from insignificant to high risk in terms of threat to the patient's life. This policy strives to be broad and flexible enough to cover the wide spectrum of identifiable causes of medically significant chest pain.

Guideline" was also wrongly excluded from evidence. This document reflects EPMG's adoption of the American College of Emergency Physicians' guidelines and defines a "Best Practice Guideline" that provides:

> **Patients with non-traumatic chest pain (or other anginal equivalents) will not be sent home after a single [ECG] or cardiac marker determination (unless other definitive studies have ruled out [a myocardial infarction]).**
>
> Obviously, some patients with obvious chest wall pain or other etiologies will not need an [ECG] or cardiac marker determination, and may be safely sent home with neither of these done. But, if a physician's index of suspicion is high enough to order an [ECG] to rule out ischemia, or a cardiac marker to rule out cardiac injury, then a second set of cardiac markers must be ordered at least four hours later — a single cardiac marker determination does not rule out [a myocardial infarction].

Defendants can certainly argue that Jilek's chest pain was not of the type to which this policy would be relevant. However, as plaintiff presented evidence that Jilek's chest pain was of that type, the document was relevant to the standard of care and thus admissible.

We affirm the trial court's exclusion of proposed exhibits 25, 26, and 29, all of which are SJMH emergency-services policies for Maple Urgent Care. Proposed exhibit 25 is captioned "Urgent Care Scope of Care." The document provides, "Patients are seen on a first-come, first-serve basis except those who are experiencing the following signs and symptoms: chest discomfort such as tightness, heaviness, squeezing, pain and/or pressure for any reason . . . ." The policy pro-

---

Finally, it seems axiomatic that it is the responsibility of the health-care professional to assign priority to the complaints of a patient rather than simply assume that whatever the patient thinks is most important is in fact so.

vides that patients experiencing such symptoms "receive prompt evaluation by a [registered nurse] and/or physician . . . ." In this case, Jilek did not disclose his chest tightness until he was seen by Dr. Stockson, so the action called for in the document—prompt evaluation by a physician—took place before the chest-pain complaint was made. Further, there is no allegation in this case that Jilek should have been seen *sooner*. Since the policy only determines what order patients are seen in, it is not implicated in this case. Similarly, plaintiff's proposed exhibit 26, another SJMH emergency-services guideline, designated as guideline number 582, governs patient check-in at the urgent-care clinic and is not relevant as Jilek did not identify his chest tightness until Dr. Stockson was already examining him. The same is true of proposed exhibit 29, which is captioned, "Pre-Physician Evaluation and Treatment" and designated as guideline number 585. This guideline addresses nursing care, not physician care.

Each of these three guidelines, however, states that chest tightness falls within the type of chest pain suggestive of cardiac involvement. Therefore, to the extent that Dr. Stockson, who signed the guidelines offered as proposed exhibits 26 and 29, testifies that Jilek's chest tightness was not suggestive of the need for immediate assessment, the guidelines could be used for purposes of impeachment. The same is true of proposed exhibit 25, which defines the scope of care at the facility where Dr. Stockson was medical director.[16]

We also affirm the exclusion of plaintiff's proposed exhibit 31, SJMH patient care policy number 305.1, entitled "Patients—Screening, Stabilization and Transfer."

---

[16] If Dr. Stockson signed or adopted other internal policies and guidelines that are not substantively admissible, the same approach would apply.

This document sets forth guidelines for "Off-Campus departments," which include Maple Urgent Care. However, the document relates to the provision of emergency care and screening regardless of the patient's ability to pay and does not include any medical guidelines relating to chest pain.

In sum, we reject defendants reading of *Gallagher* as standing for a wholesale exclusion of internal medical-provider guidelines even when they are relevant to the applicable standard of care and the injury. We hold, consistently with *Gallagher*, that while internal policies and guidelines do not in and of themselves set the standard of care,[17] they should be admitted as long as they are relevant to the applicable specialty's standard of care and to the injury alleged. Accordingly, we reverse and remand for a new trial.

### III. CONCLUSION

In sum, we conclude that the trial court erred in the standard of care instruction given to the jury and by excluding evidence of relevant policies, procedures, and guidelines. These two errors are sufficient to require a new trial. Accordingly, we reverse the judgment of no cause of action and remand for a new trial. We do not retain jurisdiction.

BORELLO, J., concurred.

BANDSTRA, P.J. (*dissenting*). I adamantly disagree with my colleagues' conclusion that a jury verdict in favor of defendants, rendered after a lengthy trial during which the jurors were presented with comprehensive testimony regarding the applicable standard of

---

[17] Thus, violation of an internal policy or guideline is not negligence per se.

care and whether defendants violated it, should be thrown out. I disagree with the majority's conclusion that the trial court erred in its determination of the issues about which plaintiff complains on appeal and, further, to the extent there were any errors, I do not think that they warrant reversal.

The majority initially agrees with plaintiff's argument that the trial court erred by concluding that the applicable standard of care here was family medicine, under MCL 600.2169. That statute specifically states that "if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty." MCL 600.2169(1)(a). Dr. Carlin Stockson is a specialist board-certified in family medicine, not emergency medicine. Thus, defendants were properly allowed to present expert testimony in defense of the claims against Dr. Stockson by board-certified family-medicine specialists. Similarly, the trial court did not err by instructing the jury that the applicable standard of care was that of "a physician specializing in family practice . . . ."[1]

---

[1] I disagree with the majority in its conclusion that "Dr. Stockson's . . . board certification as a family practitioner would not be relevant to the standard of care" because it is directly contrary to the clear statutory directive that board certification is of paramount concern. *Reeves v Carson City Hosp (On Remand)*, 274 Mich App 622, 630; 736 NW2d 284 (2007), on which the majority relies, did not consider the statute in this regard. Instead *Reeves* merely assumed, without any discussion whatsoever, that a board-certified family-medicine specialist working in the emergency room of a hospital could be held to an emergency-medicine standard of care. Moreover, common sense suggests there are large differences between an urgent-care (or, as some call it, "doc in a box") facility such as that at issue here and a hospital emergency room such as that in *Reeves*. See, e.g., *Lutz v Mercy Mt Clemens Corp*, unpublished opinion per curiam of the Court of Appeals, issued December 20, 2005 (Docket No. 261465), p 3 (stating that "clearly it is unreasonable to equate urgent care with emergency medicine").

Further, the trial court went on to specify for the jury that the applicable standard of care was that of a family-practice physician who was "working in an urgent care center . . . ." The jury had heard testimony from experts presented by both sides regarding the differences between an urgent-care facility and an emergency room, as well as the standards Dr. Stockson should have complied with as a family-medicine physician working in an urgent-care setting. To the extent that Dr. Stockson was thus held to a higher standard of care because of the place in which she practiced her family medicine and to the extent that plaintiff was allowed to present testimony from emergency-medicine experts against Stockson, plaintiff's case was strengthened, not weakened. In any event, the bottom line here is that the jurors were presented with comprehensive arguments and jury instructions that fairly presented the standard-of-care question for their resolution. They properly determined, after brief deliberations, that Dr. Stockson had not been negligent in her care of her patient.

The trial court also concluded that all of plaintiff's nine proposed documentary exhibits relating to guidelines and policies for the care of persons allegedly like the deceased were to be excluded from consideration by the jury. The majority finds fault with the trial court with respect to only three of those documents, and it does so only after concluding that it is either "not bound to follow" the only Michigan precedent directly on point, *Gallagher v Detroit-Macomb Hosp Ass'n*, 171 Mich App 761; 431 NW2d 90 (1988), or that the holding of *Gallagher* should be ignored while dictum within that precedent should be followed. I disagree with the majority and conclude that binding precedent that applied and reiterated the *Gallagher* holding cannot be distinguished away. See *Buczkowski v McKay*, 441 Mich

96; 490 NW2d 330 (1992), and *Zdrojewski v Murphy*, 254 Mich App 50; 657 NW2d 721 (2002). But, apart from all of that, even if I were to agree with the majority's conclusion that the three documents were improperly excluded, I would not conclude that it would have made any difference in the outcome of the trial.

And that brings me to my chief concern. Perhaps not surprisingly, the majority makes no mention of the standard of review we must apply on this appeal of a jury verdict:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, [or] for setting aside a verdict, . . . unless refusal to take this action appears to the court inconsistent with substantial justice. [MCR 2.613(A).]

The majority makes no attempt to explain how the errors it discerns from this record resulted in a jury verdict that was "inconsistent with substantial justice."

A fair reading of the lengthy record in this case demonstrates the exact opposite. The decedent presented to Dr. Stockson complaining only of the kind of respiratory problems that are commonplace during Michigan winters, for which he had received partially successful treatment from other caregivers over the preceding months. His chief complaint was not chest pain. In response, Dr. Stockson took some action, but she failed to take other actions that plaintiff's experts later contended should have been taken. The jurors heard lengthy testimony and argument from both sides about whether Dr. Stockson acted appropriately as a family-medicine specialist practicing in an urgent-care setting. The jury determined, in response to the first question presented on the verdict form, that Dr. Stock-

son was simply not negligent, and it rendered a verdict in favor of defendants accordingly.

The rule governing our review recognizes that no trial is perfect and allows us to disturb such a jury verdict only if it is "inconsistent with substantial justice." This is far from that kind of a case, and we should affirm.