*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOAN HIGGINS and RICHARD HIGGINS,

Plaintiffs-Appellees,

v

LARISA TRAILL, M.D., EMERGENCY
MEDICAL SPECIALISTS, PC, and ST. JOHN
PROVIDENCE HEALTH SYSTEM,

Defendants,

and

DAVID FRY, M.D., DIAGNOSTIC
RADIOLOGY CONSULTANTS, PC, and ST.
JOHN MACOMB-OAKLAND HOSPITAL,

Defendants-Appellants.

UNPUBLISHED
July 30, 2019

No. 343664
Macomb Circuit Court
LC No. 2016-001382-NH

Before: M. J. KELLY, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

In this medical malpractice action, defendants-appellants David Fry, M.D., Diagnostic Radiology Consultants, PC, and St. John Macomb-Oakland Hospital appeal by leave granted[1] the trial court order denying their motion for summary disposition.[2] Defendants moved for summary

---

[1] *Higgins v Traill*, unpublished order of the Court of Appeals, entered June 28, 2018 (Docket No. 343664).

[2] Defendants Dr. Traill, Emergency Medical Specialists, PC, and St. John Providence Health System did not apply for leave to appeal the trial court's order and are not participating in this appeal.

-1-

disposition, arguing that plaintiffs' expert witnesses, Dr. Joel Meyer and Dr. Gregg Zoarski, were unqualified to render an expert opinion on the applicable standard of care. Because the trial court did not abuse its discretion by determining the expert witnesses qualified to render an expert opinion on the applicable standard of care, we affirm.[3]

## I. BASIC FACTS

In October 2013, plaintiff, Joan Higgins, collapsed in her home. When Emergency Medical Services (EMS) arrived, Higgins could not speak, had right-sided weakness, and was experiencing facial droop. Higgins was transported to St. John Macomb-Oakland Hospital. Relevant to this appeal, plaintiffs argue that Dr. Fry read a CT angiogram of Higgins's head as normal when it actually showed an occlusion in the middle cerebral artery. Plaintiffs contend that Dr. Fry's failure to properly read the CT angiogram delayed Higgins's treatment, which caused her to experience the full effect of an ischemic stroke and resulted in her sustaining permanent neurological deficits.

Following discovery, defendants moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiffs' experts, Dr. Meyer and Dr. Zoarski, were not qualified to provide standard-of-care testimony under MCL 600.2169. Specifically, defendants asserted that the specialty that Dr. Meyer and Dr. Zoarski spent the majority of their time practicing— neuroradiology—did not match Dr. Fry's specialty—diagnostic radiology—so they were not qualified to testify against Dr. Fry. Plaintiffs, however, maintained that the specialty matched because at the time of the alleged malpractice Dr. Fry was practicing neuroradiology, not diagnostic radiology. The trial court agreed with plaintiffs, holding that Dr. Meyer and Dr. Zoarski were qualified to testify as experts against Dr. Fry under MCL 600.2169 and MRE 702, and denying defendants' motion for summary disposition.

## II. QUALIFICATION OF EXPERT UNDER MCL 600.2169

### A. STANDARD OF REVIEW

Defendants argue that the trial court abused its discretion by ruling that Dr. Fry was practicing neuroradiology when he read the CT angiogram of Higgins's head. "This Court reviews questions of statutory interpretation de novo." *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). We review for an abuse of discretion "a trial court's rulings concerning the qualifications of proposed expert witnesses to testify . . . ." *Id.* "The abuse of discretion standard recognizes that there may be no single correct outcome in certain situations; instead, there may be more than one reasonable and principled outcome." *Gonzalez v St John Hosp (On reconsideration)*, 275 Mich App 290, 294; 739 NW2d 392 (2007). "When the trial court selects one of these principled outcomes, it has not abused its discretion, and the reviewing court should defer to the trial court's judgment." *Id.* "An abuse of discretion occurs when the decision results

---

[3] Defendants also sought summary disposition on the basis that plaintiffs could not establish proximate cause. That issue, however, is not before this Court as it was not decided by the trial court and is not raised as an issue on appeal.

in an outcome falling outside the principled range of outcomes." *Woodard*, 476 Mich at 557. The determination of the relevant standard of care is a question of law that is reviewed de novo by this Court. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 16 n 16; 651 NW2d 356 (2002).

## B. ANALYSIS

Generally, in a medical malpractice action a plaintiff must establish the following elements: "(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). "Expert testimony is required to establish the standard of care and a breach of that standard[.]" *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012).

In order to provide expert testimony on the relevant standard of care, an expert witness in a medical malpractice case must meet the requirements under MCL 600.2169, which provides in pertinent part:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

Under MCL 600.2169(1), "the plaintiff's expert witness must match the one most relevant standard of practice or care—the specialty *engaged in* by the defendant physician during the course of the alleged malpractice, and, if the defendant physician is board certified in that specialty, the plaintiff's expert must also be board certified in that specialty." *Woodard*, 476

Mich at 560 (emphasis added). Further, if the defendant is practicing outside his or her area of specialty at the time of the alleged malpractice, the relevant specialty is the specialty that the defendant was practicing regardless of whether the defendant is or is not certified in the area of medicine that was being practiced so long as the defendant could *potentially* become certified in that specialty. *Reeves v Carson City Hosp (On Remand)*, 274 Mich App 622, 630; 736 NW2d 284 (2007). See also *Gonzalez*, 275 Mich App at 297 (holding that a resident is held to the standard of the specialty he or she is practicing in even though the resident is not yet a specialist in any field).

In this case, defendants contend that the specialty Dr. Fry was engaged in, i.e., practicing, during the course of the alleged malpractice was diagnostic radiology. Plaintiffs, however, contend that the specialty Dr. Fry was engaged in during the course of the alleged malpractice was neuroradiology. Recognizing that there was a factual dispute on this point, the trial court evaluated the evidence before it and the parties arguments, and the court determined that the relevant specialty was neuroradiology because that was the specialty that Dr. Fry was practicing when he read the CT angiogram of Higgins's head.

In determining that Dr. Fry was engaged in neuroradiology, the trial court first considered that Dr. Fry was in a practice group consisting of 12 radiologists, only one of whom was certified in neuroradiology. Despite the fact that one of the radiologists had a subspecialty, the group did not divide the tests based on whether someone was a radiologist or a neuroradiologist. In addition, the court considered that Dr. Fry read a CT angiogram of Higgins's head, which was a function performed by a neuroradiologist according to the American Board of Radiology's website.[4] The American Board of Radiology states that a "diagnostic radiologist" is someone who " . . . uses x-rays, radiolnuclides, ultrasound, and electromagnetic radiation to diagnose and treat disease." The American Board of Radiology further provides that a specialist in neuroradiology does the following:

> diagnoses and treats disorders of the brain, sinuses, spine, spinal cord, neck, and the central nervous system, such as aging and degenerative diseases, seizure disorders, cancer, stroke, cerebrovascular diseases, and trauma. Imaging commonly used in neuroradiology includes angiography, myelography, interventional techniques, and magnetic resonance imaging (MRI). . . .

Based on this definition, the trial court concluded that because Dr. Fry was reading an angiogram of Higgins's brain in order to diagnose and treat her stroke, he was engaged in the practice of neuroradiology. Although defendants argue on appeal that there is substantial overlap between diagnostic radiology and neuroradiology, given that there is evidence to support each view, we discern no error in the court's determination that the relevant specialty was neuroradiology because that was what Dr. Fry was practicing when he read the CT angiogram. See *Reeves*, 274 Mich App at 629-630 (stating that the relevant specialty is the one that the defendant was practicing at the time of the alleged malpractice notwithstanding that the defendant may not be

---

[4] See https://www.theabr.org/diagnostic-radiology/subspecialties#neuro, last access June 20, 2019. A printout of the webpage containing the definition is included in the court record.

certified in the specialty he was practicing in); see also *Estate of Norczyk v Danek*, 326 Mich App 113, 123; ___ NW2d ___ (2018) (stating that the one most relevant specialty was cardiology, not interventional cardiology, because the allegations of medical malpractice pertained the defendant's actions as a cardiologist, not an interventional cardiologist).[5]

[5] Having determined that the trial court did not err by determining that the one most relevant specialty was neuroradiology, we likewise discern no abuse of discretion in the court's determination that plaintiffs' experts were, therefore, qualified to provide standard-of-care testimony against Dr. Fry.

In order to satisfy the first requirement of MCL 600.2169(1)(a), plaintiffs' experts must have the same specialty as Dr. Fry had "at the time of the occurrence that is the basis for the action . . ." See *Woodard*, 476 Mich at 560. In *Woodard*, our Supreme Court defined "specialty" as "a particular branch of medicine or surgery in which one can potentially become board certified." *Woodard*, 476 Mich at 561. Relatedly, a " 'subspecialty' is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty." *Id*. at 562. Thus, for purposes of MCL 600.2169(1), although more particularized, a subspecialty "is nevertheless a specialty." *Id*. Here, it is undisputed that neuroradiology is a subspecialty of diagnostic radiology. Accordingly, as Dr. Fry was practicing neuroradiology, plaintiffs' experts were also required to practice neuroradiology. See *id*. at 561-562 ("[I]f the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery."). Thus, because the trial court determined that Dr. Fry was practicing neuroradiology during the alleged malpractice, and because neuroradiology is a subspecialty, plaintiffs' experts were required to share that same specialty. The evidence submitted to the trial court established that both plaintiffs' experts were board-certified in diagnostic radiology and had CAQs in neuroradiology, so they have the same specialty as Dr. Fry did at the time that he allegedly committed malpractice.

MCL 600.2169(1)(a) also requires that if the defendant physician is board-certified, the expert witness must be a specialist who is board-certified in the same specialty. See *Woodard*, 476 Mich at 562. In *Woodard*, our Supreme Court explained that "if a defendant physician has received a certificate of special qualifications, the plaintiff's expert witness must have obtained the same certification of special qualifications in order to be qualified to testify under § 2169(1)(a)." *Id*. at 565. In this case, as Dr. Fry did not have a certification of added qualification in neuroradiology, it is not relevant whether plaintiffs' experts held such a certificate.

Next, "MCL 600.2169(1)(b) provides that if the defendant physician is a specialist, the expert witness must have 'during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either . . . the active clinical practice of that specialty . . . .' " *Woodard*, 476 Mich at 565, quoting MCL 600.2169(1)(b). Here, Dr. Meyer testified that he spent the majority of his time practicing neuroradiology in the year immediately preceding the date of Dr. Fry's alleged malpractice, so

Defendants assert that *Reeves* was overruled by our Supreme Court. We disagree. In *Jilek v Stockson*, 289 Mich App 291, 302-303; 796 NW2d 267 (2010) (*Jilek I*), rev'd sub nom *Estate of Jilek v Stockson*, 490 Mich 961; 805 NW2d 852 (2011) (*Jilek II*), recon den 491 Mich 870 (2012) (*Jilek III*), this Court, relying in part on *Reeves*, held that the trial court erred when it ruled that the one most relevant specialty was "family practice" where the defendant physician, who only possessed a family medicine board certification, allegedly committed malpractice while working at an urgent care facility. This Court held that "the proper standard of care was that for emergency-medicine specialists" because the terms "urgent" and "care" were "more consistent with the scope of emergency medicine than they [were] with the scope of family practice." *Jilek I*, 289 Mich App at 302-303. In *Jilek II*, the Michigan Supreme Court reversed this Court's holding in *Jilek I* because it held that the trial court "correctly determined as a matter of law that the appropriate standard of care was 'family practice' because the defendant physician [was] board-certified solely in family medicine." *Jilek II*, 490 Mich at 961.

In *Jilek III*, the Michigan Supreme Court denied a motion for reconsideration. *Jilek III*, 491 Mich at 870. Justice MARKMAN authored a concurrence to the order denying the motion for reconsideration, wherein he explained that he believed "the 'one-most-relevant-specialty' test is only applicable if the defendant has more than one specialty," and although the defendant "was practicing family medicine at the time of the alleged malpractice," that was "irrelevant because [the] defendant has only one specialty, and the 'one-most-relevant-specialty' test [was] inapplicable." *Jilek III*, 491 Mich at 872 (MARKMAN, J., concurring). Therefore, Justice MARKMAN explained, that "[t]o the extent that" *Reeves* was "inconsistent with this conclusion, [it was], in [his] judgment, necessarily overruled by" *Jilek II*. *Jilek III*, 491 Mich at 872 (MARKMAN, J., concurring).

Notably, the Michigan Supreme Court's holding in *Jilek II* explained that "the appropriate standard of care was 'family practice' because the defendant physician [was] board-certified *solely in family medicine*." *Jilek II*, 490 Mich at 961 (emphasis added). The Michigan Supreme Court provided no further guidance regarding its rationale in *Jilek II*. Therefore, it is unclear if the holding of *Jilek II* was based in part on a determination that the defendant physician in *Jilek* was not practicing outside her board certification of "family practice" when she provided medical services at an urgent care facility, which rendered only her actual board certification relevant. As the Michigan Supreme Court provided no further explanation, and it did not explicitly question the rationale of *Reeves* in *Jilek II*, there is no reason to assume that the Michigan Supreme Court intended for *Jilek II* to implicitly reverse *Reeves*. We, therefore,

---

he satisfies he practice requirement in MCL 600.2169(1)(b). Further, Dr. Zoarski testified that he spent the majority his time conducting "interventional procedures," but he clarified that his interventional training was part of his neuroradiology fellowship. Accordingly, Dr. Zoarski satisfies the practice requirement in MCL 600.2169(1)(b).

In sum, with neuroradiology as the one most relevant specialty, the plaintiffs' experts satisfy the requirements in MCL 600.2169(1), so they are qualified under that statute to offer opinion testimony on the appropriate standard of care.

remain bound to follow *Reeves*. See *Straman v Lewis*, 220 Mich App 448, 451; 559 NW2d 405 (1996).

Affirmed.

/s/ Michael J. Kelly
/s/ Jane E. Markey