*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VIKING GROUP, INC.,

        Plaintiff/Counterdefendant-
        Appellee,

v

ROBERT BRUCKMAN,

        Defendant/Counterplaintiff-
        Appellant,

and

APRIL COREY,

        Defendant/Counterplaintiff.

UNPUBLISHED
May 7, 2020

No. 347778
Kent Circuit Court
LC No. 15-004861-CK

Before: MARKEY, P.J., and JANSEN and BOONSTRA, JJ.

PER CURIAM.

Defendant, Robert Bruckman, acting *in propria persona*, appeals as of right the final judgment entered against him following a bench trial. We affirm.

## I. FACTUAL BACKGROUND

Plaintiff, Viking Group, Inc (Viking), defendant's former employer, filed a complaint alleging, *inter alia*, that Bruckman breached the parties' Confidentiality Agreement. Specifically, Viking alleged that around the time Bruckman resigned from his position as Viking's Director of Manufacturing Engineering, he misappropriated confidential information by sending it to his own personal computer. Under paragraph 8 of the Confidentiality Agreement, Viking also sought attorney fees and other actual costs necessitated by its enforcement of the Confidentiality Agreement.

The case proceeded to a bench trial. Dennis Quam, Viking's Vice President of Human Resources, testified that Viking required Bruckman to sign the Confidentiality Agreement when he began his employment because he would have access to confidential and proprietary

-1-

information relating to new product development, manufacturing processes, strategic plans, capital projects, and business information. The Confidentiality Agreement provided, in relevant part:

**3. Confidential Information:**

"Confidential Information" includes any and all information related to the business of the Company or its customers, including but not limited to information concerning pricing, customers, products, processes, designs, materials, specifications, research, development, customer contacts, procedures, forms, marketing and sales strategies, etc. "Confidential Information" includes information that is in existence as of the date of this Agreement, and also includes information that is prepared, created or developed by Employee or any other person or entity after the date of this Agreement. Confidential Information is and will remain the sole property of the Company. Employee will treat all Confidential Information as strictly confidential. Employee will not, during or after Employee's employment with the Company, disclose Confidential Information to any other person or entity, nor use Confidential Information for the benefit of Employee or any party other than the Company. In the event that Employee's employment with the Company ends, Employee shall immediately return to the Company all documents or materials containing any Confidential Information.

\* \* \*

**8. Remedies:**

Employee acknowledges that any breach of the terms of this Agreement by Employee will cause irreparable damage to the Company and that money damages would not be sufficient to provide a fully adequate remedy for such a breach. Therefore, in the event of a breach or threatened breach of any term of this Agreement, the Company will be entitled to temporary, preliminary and permanent injunctive relief without any requirement of bond, in addition to any other legal or equitable remedies to which the Company may be entitled. . . . Employee shall be responsible to pay for the actual costs and attorney fees incurred by the Company in the enforcement of this Agreement.

Quam testified that in February 2015, Viking's management determined that Bruckman was no longer a good fit as the company's director of manufacturing engineering. In exchange for working another 90 days to help facilitate a transition, Viking offered Bruckman a severance package. However, rather than working for the full 90-day period, Bruckman, who was vocal about his displeasure with management's decision, accepted other employment and announced his intention to resign effective May 4, 2015. As a result, Quam determined that Bruckman was not eligible to receive the severance package.

Bruckman responded by threatening litigation if he did not receive certain compensation, including additional vacation pay, bereavement time, the vesting of his 401k, and a discretionary bonus. At this point, conscious of the possibility of impending litigation, Quam began reviewing Bruckman's e-mails and other correspondence pursuant to company policy and found that

Bruckman had sent numerous e-mails to his wife and to his personal e-mail address that Quam believed breached the terms of confidentiality. One e-mail was sent to Bruckman's personal e-mail address on May 3, 2015, and contained financial sales data and financial information. Quam considered this e-mail suspicious because it was sent in such close proximity to Bruckman's departure. Another e-mail was sent to Bruckman's wife on March 28, 2014, and contained details of a sprinkler assembly manufacturing process. A third e-mail was sent to Bruckman's wife in February 2012 and contained specifics respecting a potential business acquisition. Quam considered these e-mails suspicious because their contents were highly confidential and there was no reason why Bruckman's wife should have had access to them. Quam decided it was necessary to file this instant suit to protect Viking's interests because disclosure of this information could cause great harm to Viking.

Bruckman testified at trial, and acknowledged that he signed the Confidentiality Agreement when he joined Viking in June 2011. He also acknowledged that he sent the e-mails in question. He maintained that he understood the importance of confidentiality, but that he and his wife had been married for 33 years, "[a]nd so with relaying information to her because I was short staffed and she did certain things for me like proofreading, and putting things in binders, and other things, that it was a reasonable expectation of mine that that was a maintenance of the confidential information that was being sent over" and that he would "totally trust her not to break confidentiality." He denied that any additional disclosure to other persons occurred. He also denied that Viking suffered any harm as a result of his actions but again acknowledged that at least some of the information he disclosed to his wife was confidential.

At the end of the three-day trial, the trial court found in favor of Viking, and issued its findings of fact and conclusion of law in a written opinion. It recognized that it was undisputed that Bruckman had sent sensitive information to his home computer and to his wife's personal e-mail address. The trial court determined that by doing so, Bruckman breached his contractual restriction. Accordingly, the trial court found that Viking was entitled to (1) a permanent injunction prohibiting any further dissemination of confidential information belonging to Viking; (2) nominal damages; and (3) as a matter of contract, the "actual costs and attorney fees incurred" as a result of the enforcement of the parties' agreement.

The trial court held an evidentiary hearing on the amount of costs and attorney fees incurred by Viking, and afterward issued a second opinion and order awarding Viking $254,657.50 in attorney fees, $345.70 in taxable costs, and interest on the award. The trial court entered a final judgment memorializing its decision concerning the amount of damages and also granted injunctive relief prohibiting Bruckman "from retaining, disclosing to any person or entity, or using for any purpose any confidential information . . . obtained in the course of his employment with Viking." The trial court denied Bruckman's motion for relief from the judgment. This appeal followed.

## II. BREACH OF CONTRACT

Bruckman's first two arguments on appeal concern whether Viking sustained its burden to prove the elements for breach of contract. First, Bruckman argues that Viking did not prove that it sustained any damages as a result of the disclosure. Second, Bruckman argues that it is against

public policy for a disclosure to a spouse to constitute a breach of his Confidentiality Agreement. We disagree.

"Following a bench trial, this Court reviews findings of fact for clear error and conclusions of law de novo." *Florence Cement Co v Vettraino*, 292 Mich App 461, 468; 807 NW2d 917 (2011). "A factual finding is clearly erroneous if there is no substantial evidence to sustain it or if, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 172-173; 848 NW2d 95 (2014). "The legal effect of a contractual clause is a question of law that is reviewed de novo." *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 369; 666 NW2d 251 (2003).

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co*, 495 Mich at 178. However, in cases where a breach occurs but does not cause any quantifiable harm, a plaintiff becomes entitled at least to nominal damages on account of the defendant's breach. See *Kolton v Nassar*, 358 Mich 154, 158; 99 NW2d 362 (1959); see also *Vandenberg v Slagh*, 150 Mich 225, 229; 114 NW 72 (1907) ("In actions for breach of contract, nominal damages are recoverable upon proof of the breach . . . ."); *4041-40 W Maple Condo Ass'n v Countrywide Home Loans, Inc*, 282 Mich App 452, 460; 768 NW2d 88 (2009) (stating "the law infers some damage—at least nominal damage—from the breach of a contract"). "Nominal damages are those damages recoverable where [the] plaintiff's rights have been violated by breach of contract or tortious injury, but no actual damages have been sustained or none can be proved." *4041-40 W Maple Condo Ass'n v Countrywide Home Loans, Inc*, 282 Mich App 452, 460; 768 NW2d 88 (2009) (quotation marks and citation omitted).

The trial court did not err by determining that Bruckman's disclosure of confidential information to his spouse violated the terms of the Confidentiality Agreement. In support of is argument that disclosing confidential information to his wife, Corey, did not constitute a breach of the Confidentiality Agreement, Bruckman refers generally to the spousal testimonial privilege. Although spousal privilege bars a husband or wife from testifying against his or her spouse without that spouse's consent, MCL 600.2162, Bruckman does not cite any legal basis for why that spousal privilege should be extended here. Indeed, we conclude that it does not have any application to this case.[1]

---

[1] Moreover, as articulated in *Mitcham v Detroit*, 355 Mich 183, 203; 94 NW2d 388 (1959):

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.

Bruckman has therefore essentially abandoned this argument on appeal. See *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 626-627; 750 NW2d 228 (2008), where this Court concluded that

We also reject Bruckman's argument that the contested contractual language was somehow ambiguous or violated public policy. Our Supreme Court has articulated that it is a "bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003). We conclude that the contractual language at issue here unambiguously prohibited disclosure of any confidential information to any other person, including Corey. Moreover, we find no basis for concluding that such a contractual provision violates Michigan law or public policy.

Bruckman breached the Confidentiality Agreement willingly entered into the by parties by disclosing confidential information to his wife, Corey. Thus, the trial court did not err by entering a judgment in favor of Viking and awarding nominal damages. *Kolton*, 358 Mich 158.

III. ATTORNEY FEES

Bruckman's final two arguments concern the trial court's award of attorney fees. First, Bruckman argues that the trial court should have adjusted the attorney fee award downward, and that the trial court inconsistently applied its own methodology when reviewing Viking's attorney's billing statements. Again, we disagree.

This Court reviews a trial court's award of attorney fees and costs for an abuse of discretion. *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id*.

"A court may award costs and attorney fees only if specifically authorized by a statute, a court rule, or a recognized exception to the American rule (which mandates that a litigant be responsible for his or her own attorney fees)." *Hackel v Macomb Co Comm'n*, 289 Mich App 311, 334; 826 NW2d 753 (2012). "An exception exists where attorney fees are provided by contract of the parties." *Fleet Business Credit, LLC v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 589; 735 NW2d 644 (2007). "The parties to a contract may include a provision that the breaching party will be required to pay the other side's attorney fees and such provisions are judicially enforceable," although any "recovery is limited to *reasonable* attorney fees." See *Zeeland Farm Servs, Inc v JBL Enterprises, Inc*, 219 Mich App 190, 195-196; 555 NW2d 733 (1996) (emphasis added).

The Confidentiality Agreement allows for Viking to recover attorney fees expended in enforcing the agreement. The framework set forth by our Supreme Court in *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008), remains the standard for determining the reasonableness of requested attorney fees. *Pirgu*, 499 Mich at 278-279. Under the *Smith* framework, the trial court begins its analysis by "determining the fee customarily charged in the locality for similar legal

---

"[a]n argument must be supported by citation to an appropriate authority or policy" and failure to do so constitutes an abandonment of the issue.

services" based on "reliable serveys or other credible evidence of the legal market." *Smith*, 481 Mich at 530-531 (opinion by TAYLOR, C.J.). Next, "[t]his number should be multiplied by the reasonable number of hours expended in the case[.]" *Id*. This calculation "should serve as the starting point for calculating a reasonable attorney fee." *Id*.

Finally, the trial court should consider the following list of non-exhaustive factors to determine whether an upward or downward adjustment of attorney fees is appropriate:

> (1) the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (2) the difficulty of the case, i.e., the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly,
>
> (3) the amount in question and the results obtained,
>
> (4) the expenses incurred,
>
> (5) the nature and length of the professional relationship with the client,
>
> (6) the likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer,
>
> (7) the time limitations imposed by the client or by the circumstances, and
>
> (8) whether the fee is fixed or contingent. [*Pirgu*, 499 Mich at 281-282.]

"In order to facilitate appellate review, the trial court should briefly discuss its view of each of the factors above on the record and justify the relevance and use of any additional factors." *Id*.

The trial court here acknowledged its duties under the *Smith* framework, as well as its responsibility to evaluate the appropriateness of an upwards or downwards adjustment, and then followed the framework as instructed by our Supreme Court in a ten page Opinion and Order Awarding Attorney Fees, Costs, and Interest. In addressing whether an adjustment was appropriate, the trial court reasoned as follows:

> The [c]ourt's computation of a reasonable attorney fee is subject to modification, either up or down, based upon eight factors. See *Pirgu*, 499 Mich at 282. The [c]ourt finds, however, that none of those eight factors warrants any adjustments of the "baseline figure" in this case. The "experience, reputation, and ability of the lawyer or lawyers performing the services" has been adequately taken into account in the four attorneys' approved hourly rates. See *id*. Although this case was protracted, "the difficulty of the case" does not support an upward adjustment. See *id*. Although the damages assessed by the Court were modest, the amount in question and the results obtained" do not justify a downward adjustment because Defendant Bruckman prolonged the litigation in every way possible. See *id*. The "expenses incurred" were not extraordinary. See *id*. Both the "nature and length of the professional relationship with the client" do not militate in favor of

any type of adjustment. See *id.* The record contains no evidence that Plaintiff Viking's attorneys had to turn down other legal work to handle this matter. See *id.* The "time limitations imposed by the client or by the circumstances" were not unreasonable. See *id.* Finally, the attorneys billed by the hour, rather than through a fixed or contingent fee. See *id.*

Our Supreme Court has explained that the eight considerations at the third step of the analysis should be regarded as illustrative, rather than exhaustive. See *Pirgu*, 499 Mich at 282. Indeed, our Supreme Court has noted that "the trial court may consider additional relevant factors," *id.*, and Defendant Bruckman has made two arguments predicated upon factors not mentioned in the *Pirgu* decision. First, Bruckman contends that Plaintiff Viking should not be rewarded for undertaking this vindictive litigation, which was designed simply to punish him. To be sure, animosity plainly exists between Bruckman and Viking, but the [c]ourt cannot find that Viking impermissibly sued Bruckman out of spite. Second, Bruckman faults Viking for unnecessarily dragging his wife, April Corey, into the litigation. To be sure, Viking ultimately opted to dismiss its claims against Corey, but she chose nonetheless to take part in the trial, where she unsuccessfully pursued counterclaims against Viking. In any event, Bruckman cannot vicariously assert this wife's grievances in an effort to defeat Viking's request for reasonable attorney fees and costs. Accordingly, the [c]ourt concludes that the "baseline figure" of $254,657.50 constitutes a "reasonable" attorney fee for Viking in this case.

The trial court went on to explain in a footnote:

To be sure, the "baseline figure" is an eye-popping number, but commercial litigation is not cheap. Plaintiff Viking's attorney fees for this protracted legal battle must be paid by someone. The [c]ourt concludes that Defendant Bruckman agreed, as a matter of contract, to pay those attorney fees. In Michigan, our courts "enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals to freely arrange their affairs via contract." *Rory v Continental Ins Co*, 473 Mich 457, 468[; 703 NW2d 23] (2005). The [c]ourt cannot undo what the parities chose to do *via* contract.

On appeal, Bruckman focuses only on the third *Pirgu* factor: the amount in question and the results obtained. Bruckman argues that it was "irrational and unreasonable" for Viking to spend such a significant amount of money litigating a case only to win nominal damages. Therefore, Bruckman argued, the trial court should have adjusted the amount of attorney fees downward. We disagree.

Bruckman focuses too narrowly on the existence of the award of nominal damages, and essentially is reiterating his argument that Viking did not suffer "real" damages, so it is not entitled to attorney fees. Bruckman's view is misguided. After terminating Bruckman's employment, Viking became aware that Bruckman was disgruntled, and had misappropriated sensitive and confidential information in violation of the Confidentiality Agreement voluntarily entered into by both parties. In pursuing this litigation, Viking took the necessary steps to fully enforce the terms of the Confidentiality Agreement and safeguard its manufacturing schematics, financial data, and

-7-

the like. That same Confidentiality Agreement provided that Bruckman "shall be responsible to pay for the actual costs and attorney fees incurred by [Viking] in the enforcement of this Agreement." Moreover, Bruckman prolonged this litigation by being less than forthcoming during the discovery process. During the course of trial, there was the overt suggestion that Bruckman's "pride and dignity" caused him to dig in his heels and continue this dispute to the bitter end.

The trial court ultimately concluded that there was no justification for a downward adjustment of reasonable attorney fees incurred by Viking. After reviewing the record before us, we conclude that the trial court's determination not to adjust Viking's attorney fees was within the range of reasonable and principled outcomes, and therefore not an abuse of discretion.

Finally, Bruckman argues that the trial court inconsistently reviewed billing entries submitted by Viking's counsel. Bruckman specifically argues that he "reviewed the [trial c]ourt's opinion and Exhibit A methodology utilized by the court in careful detail," yet was unable to "discern the [trial c]ourt's approach to determining baseline billable hours in this case." Bruckman submits a list of more than 100 billing entries that he believes cannot constitute reasonable attorney fees because they are too vague, redundant, unnecessary, or related to clerical or other support staff work. However, Bruckman does not identify or explain the methodology he believes the trial court used, or how the billing entries identified were analyzed using a second, unexplained methodology.

Regardless, we have reviewed all of Viking's counsel's billing entries, and based on our review, conclude that it was not outside the range of reasonable and principled outcomes for the trial court to have included the 100 entries identified by Bruckman in the attorney fee award. Bruckman argues that some entries were too vague, however he fails to appreciate that an attorney is not required to submit "an exhaustive and detailed list of the precise service provided at every moment." *McNeel v Farm Bureau Gen Ins Co of Mich*, 289 Mich App 76, 102; 795 NW2d 205 (2010). Moreover, Bruckman fails to appreciate that a client is represented by each member of a law firm that the client employs, and it is unreasonable to assume that multiple attorneys working on a case together would not communicate or collaborate in an effort to advance the case. *Attard v Citizens Ins Co of America*, 237 Mich App 311, 328-329; 602 NW2d 633 (1999). Likewise, a trial court does not abuse its discretion by including the time spent on a case by support staff or clerical staff, as well as other overhead, as part of a reasonable attorney fee. *Teran v Rittley*, 313 Mich App 197, 210-211; 882 NW2d 181 (2015). Thus, we conclude that the trial court's attorney fee award did not constitute an abuse of discretion.

Affirmed. Plaintiff may tax costs, having prevailed in full. MCR 7.219.

/s/ Jane E. Markey
/s/ Kathleen Jansen
/s/ Mark T. Boonstra