McKERNAN *v.* DETROIT CITIZENS' STREET-RAILWAY CO.

1. STREET RAILWAYS — CITY FIREMEN — PERSONAL INJURIES — ACTIONS — PLEADING — AMENDMENT.

In an action by a fireman against a street-railway company for injuries resulting from collision with a street car passing an engine house as plaintiff emerged therefrom, riding on the rear of a fire engine, it was claimed that the declaration would not support a recovery based upon negligence of the motorman at any time before he had actual knowledge that the engine was coming out of the engine house. Defendant had verdict, and on error it insisted that the verdict settled that there was no negligence after the discovery of plaintiff's exit, and that therefore the questions raised by appellant as to imputed negligence, etc., were immaterial. *Held*, that, as the evidence covering plaintiff's whole case was received without objection as to the pleadings, the court on error could not assume that an amendment would have been refused, and would consider the whole case.

2. SAME — PASSING ENGINE HOUSE — RULES — CONSTRUCTION.

In an action by a fireman against a street-railway company for injuries resulting from collision with a street car passing an engine house as plaintiff emerged therefrom, riding on

the rear of a fire engine, a rule of the railway company requiring that cars, when passing engine houses, must not go faster than four miles an hour, should not be construed as applying only to the space directly in front of an engine house, and to impose on the motorman no obligation to approach the engine house at a reduced rate.

3. SAME—RULE—DUTY IMPOSED.
    The existence of this rule would not add to the railway's obligations to the public, so as to make its violation negligence per se, but was evidence bearing on the question whether a faster rate was in accordance with careful management, and if plaintiff had knowledge of it, it might have a bearing on the question of his contributory negligence.

4. IMPUTED NEGLIGENCE—FELLOW-SERVANTS—CITY FIREMEN.
    The negligence of the driver of a fire engine was not imputable to the engineer, who, in the performance of his duty, was riding on the rear end of the engine when it collided with a street car.

Error to Wayne; Rohnert, J. Submitted June 9, 1904. (Docket No. 5.) Decided December 22, 1904.

Case by John McKernan against the Detroit Citizens' Street-Railway Company for personal injuries. There was judgment for defendant, and plaintiff brings error. Reversed.

*Orla B. Taylor*, for appellant.

*Brennan, Donnelly & Van De Mark*, for appellee.

MONTGOMERY, J. This is an action to recover for injuries sustained by the alleged negligence of the defendant. The case was submitted to the jury, resulting in a verdict for defendant. The testimony on the part of the plaintiff tended to show the following facts: At the time of the accident the defendant was operating a single-track railway upon Congress street, in the city of Detroit. Electric cars were operated in an easterly direction over this track. Fire engine house No. 19 is located on the north side of Congress street, between Chene street, on the

west, and Joseph Campau avenue, on the east. The distance from Chene street to Joseph Campau avenue is 881 feet. The engine house is 686 feet east of Chene street. The block being a very long one, there is a trolley station 271 feet west of the west lot line of the engine house. The engine-house lot is 55 feet in width, the building extending from the east line of the lot to within 13 feet of the west lot line. There are two 10-foot doorways, through which the engine and hose cart gain entrance to the street. These doors are separated by a space of 5 feet. Each doorway has two doors, which swing outward, and when opened can be seen from the corner of Chene street. At the time of the accident the hose cart came out of the west door, and the engine out of the east door. Congress street is 60 feet in width. The paved portion of the street is 30½ feet in width, the car track is 4 feet and 7 inches wide, and the distance from the track to the curb line is 12 feet and 10 inches. The engine house is 31 feet from the curb line, and there is a brick-paved runway, with a fall of a little over 2 feet, leading down to the street. The fire engine weighed 9,600 pounds. It was about 12 feet long from the front end of the suction pipes to the back end. The suction pipes stick out about 2 feet behind the rear wheels. Three horses were used to draw the engine. In order to handle it as it emerged from the engine house, it was necessary to take a course in a southwesterly direction to the southerly side of the car track, gradually turning to the west.

The plaintiff at the time of the accident was the engineer of the fire engine. As such, it was his duty, when the engine left the house, to take his position at the rear end of the engine, between the suction pipes. He had nothing whatever to do with the management of the horses.

The accident occurred on September 25, 1900, at about 11:30 in the forenoon. It was a warm, clear day. The car was proceeding in an easterly direction at a speed which is variously estimated from 8 to 15 miles an hour. Just after the car passed the trolley station, the hose cart

emerged from the west door of the engine house. Capt.
Ortwine and the driver, Kemberling, were upon the seat
of the hose cart. The bell was rung before starting and
while leaving the engine house. The ringing continued
until the hose cart was clear out into the street. Kember-
ling turned westerly and proceeded about 50 or 60 feet in
the car track, when Ortwine called his attention to the
fact that the approaching car had not stopped in the usual
manner. He then turned to the left, out of the track, and
the back end of the hose cart, as it swung out of the
track, cleared the car by about 2 feet. The car was about
100 feet from the hose cart when Kemberling turned off
the track. Thus the car passed the hose cart about 100
feet westerly of the engine house lot line, or about 113 feet
from the house itself.

Just as the hose cart passed the car, the engine came
out of the house. Lieut. Murphy and Schneider, the
driver, were seated upon the engine seat. Plaintiff was
standing upon the rear of the engine, between the suction
pipes. After clearing the doors of the house, Schneider
drove in a southwesterly direction across the car track.
The engine was nearly across the track, when the car
struck the right hind wheel with great violence. The
engine, weighing nearly 5 tons, was tipped over, the tire
of the wheel, 2 inches wide and seven-eighths of an inch
thick, was cut in two, and plaintiff was severely injured.
The collision occurred practically on the line of intersec-
tion of the west lot line with the car track. The motor-
man was an experienced man, and was entirely familiar
with the location of the engine house. He heard the
alarm, and he saw the horses just as they were coming
out of the house. He states that the track was slip-
pery and wet. There was evidence, however, that it
was a warm, clear day, and that the track was dry.

Evidence of experts was given as to the distance within
which a car could be stopped when going at various rates
of speed. Witness Smith testified that a car going at the
rate of 10 miles an hour could be stopped in 80 feet, and

at 7 miles an hour in 50 feet, and at lesser rates in a correspondingly less distance.  Witness Haire fixed the distance at 100 feet and 60 feet, at the rates of 10 and 7 miles, respectively.  Cole, the motorman, says that his schedule time was 12 miles an hour, and that when the car was in proper shape he could make stops in a car length—about 30 feet.

A rule of the company reads as follows:

"Motormen, when passing schools at the time of commencement or the letting out of same, or when passing by engine houses, must not go faster than four miles an hour."

The circuit judge submitted to the jury the question of defendant's negligence, but held that the defendant's rule cut no figure in the case.  The circuit judge also held that the negligence of the driver of the fire engine should be imputed to the plaintiff, and that:

" The negligence of the fire people [evidently meaning the driver] in not looking and listening before they came out of the engine house relieved the company from liability for any negligence on the part of the motorman in violating any rule which required him to keep his car in check in approaching an engine house, up to the moment when the motorman had knowledge that the apparatus was coming out of the house."

It was strenuously insisted on the argument in this court that the form of the plaintiff's declaration was such as to preclude a recovery based upon negligence of the motorman at any time before he had actual knowledge that the engine was coming out of the engine house, and that the jury must have found, under the court's instruction, that there was no negligence on the part of the motorman after discovering the fire engine, and that therefore the questions discussed by appellant became immaterial.  It is not altogether clear that the jury would understand from the charge that the question of the motoman's negligence was the only one left for consideration; but, however this may be, the record shows that the plaintiff's whole case was covered by the testimony, and it does not

appear that any question was made as to the sufficiency of the pleading to cover the case made. We cannot assume that, had such a point been made, the circuit judge would have refused an amendment. See *Ross* v. *Township of Ionia*, 104 Mich. 320; *Findlay* v. *Railway*, 106 Mich. 700; *Garn* v. *Lockard*, 108 Mich. 196; *Thomas* v. *Railroad Co.*, 114 Mich. 59; *Robinson* v. *Railway Co.*, 103 Mich. 607.

The circuit judge apparently construed the rule above quoted as imposing no obligation upon the motorman to *approach* the engine house at a reduced rate of speed, but was of the opinion that the four-mile limit was fixed for the period of time when the car was actually passing the forty-two feet in front of the engine house. We think such a construction renders the rule wholly ineffectual to accomplish any good. As pointed out by plaintiff's counsel, if the west line of this engine house had been reached by the car with no apparatus coming out of the house, the safety of all concerned would have been best assured by the car being speedily removed from in front of the engine house. The real purpose of this rule was evidently to challenge the attention of defendant's employés to the necessity of *approaching* the engine house with the car under control, and fixing a speed of four miles an hour as a safe limit.

The existence of this rule did not add to the defendant's obligations to the public, as shown by the opinion of Mr. Justice Hooker, filed herewith. If, however, knowledge of this rule was possessed by the plaintiff, this might have a distinct bearing upon the question of his contributory negligence.

Was the negligence of the driver of this engine imputable to the plaintiff, in such sense as that, if the driver was guilty of contributory negligence, recovery by the plaintiff is precluded? We think not. Whatever may be the rule as to joint undertakers where one may be said to be the agent of the other, or between employer and employé, where one is clearly the agent of another, or between a driver and a mere volunteer, in which case, per-

haps, an implied agency may be said to exist, we are unable to see why, in a case like the present, where two fellow-servants having duties to perform, the one wholly distinct from the other, are severally engaged in the performance of such duties, the negligence of one should be imputed to the other. The cases are numerous in which the courts have refused to apply the doctrine of imputed negligence in such cases.

A case in point is *Bailey* v. *Jourdan*, 18 App. Div. 387. In that case two policemen were sent out in an ambulance to secure a prisoner. One drove the wagon. The other (the plaintiff) was inside the ambulance. A collision occurred, to which the negligence of the driver contributed. It was held that, as the plaintiff had nothing to do with the driving, but as this was a separate and independent duty, to which his fellow policeman was assigned, the negligence of the latter could not be imputed to him.

*Cray* v. *Railroad Co.*, 23 Blatchf. 263, is an instructive case. In that case the question presented was whether the negligence of a locomotive engineer was to be imputed to a fireman on his engine, as contributory negligence, in an action brought against a stranger road for injuries sustained by the fireman in a collision. It was held that the negligence of the engineer was not so imputable to the fireman. It was said that, although the plaintiff was a fellow-servant of the engineer, he was a subordinate, and had no control over the movements of the locomotive. Upon the facts found, he was no more accountable for the misconduct of the engineer than a passenger would be.

The same rule was conversely applied when it was sought to impute to the plaintiff, an engineer, the negligence of his fireman, who was a fellow-servant. *Chicago, etc., R. Co.* v. *Chambers*, 68 Fed. 148. See, also, *Hobson* v. *Milk Co.*, 25 App. Div. 111, and *Seaman* v. *Koehler*, 122 N. Y. 646. And speaking generally, the rule is that, when one is injured by the negligence of a third person concurring with that of a fellow-servant, the contribu-

tory negligence of the latter constitutes no defense.    1
Thompson on Negligence, § 505.    There are cases holding
that, where two are engaged in a joint enterprise, the one
is the agent of the other, in such sense that the negligence
of either will be imputed to the other.    *Cass* v. *Railroad
Co.*, 20 App. Div. 594; *Yahn* v. *City of Ottumwa*, 60
Iowa, 429; *Omaha, etc., R. Co.* v. *Talbot*, 48 Neb. 627.
These cases rest upon the ground of agency, and do not
at all militate against the doctrine stated above.    Our own
case of *Mullen* v. *City of Owosso*, 100 Mich. 103, applied
the doctrine of imputed negligence to one sui juris who
voluntarily becomes a passenger with another in a vehicle
driven by that other.    That case has support in adjudi-
cated cases.    *Brickell* v. *Railroad Co.*, 120 N. Y. 290.
But that case does not go so far as to impute the negli-
gence of one fellow-servant to another.

For the errors pointed out, the judgment is reversed, and
a new trial ordered.

The other Justices concurred.

HOOKER, J. (*concurring*).    The plaintiff was injured
while riding upon a fire wagon or truck as it emerged
from an engine house, being struck by a street car as it
was crossing the track.    Counsel for the plaintiff were
allowed to prove that the defendant had directed its em-
ployés to reduce the speed of cars to four miles an hour
when passing schoolhouses and fire-engine stations.    This
took the form of a printed regulation which was distributed
among such employés as had the control or driving of cars.

Two claims might be made for this evidence:    (1) That
a failure to observe the rule was per se negligence;    (2)
that it was evidence bearing upon the question of whether
a faster rate was in accordance with good railroading.

We consider it unnecessary to cite authorities to prove
that a railroad company may lawfully make rules and
regulations, and, were the question before us, we might
perhaps say as much in regard to its obligations to con-
duct its business under such rules and regulations as

would be required to relieve it from the dangers incident to looseness of management and method; and we have little doubt that a failure to provide rules necessary to the ordinary safety of good railroading might constitute actionable negligence, if followed by disaster and injury, in favor of patrons, if not of employés. But the law recognizes the right of the railroads to make rules for their own convenience and benefit, and the courts would be likely to uphold as reasonable a rule, made out of abundant caution, having for its object the reduction of danger to a point far below that attained by ordinarily prudent management, which is the common test prescribed by law. And it would be unfortunate if such a practice were to be penalized by permitting the fact of extraordinary care to increase the responsibility imposed by law, the natural if not inevitable consequence of which would be to induce reluctance to adopt new measures and regulations. There are many rules made by railroads, and they are subject to greater or less changes from time to time. We have said more than once that courts and juries cannot be allowed to make rules and regulations and prescribe methods for railroad management. They may determine whether certain conduct is negligent or not, but the test is not, or should not be, their abstract notions of railroading, but, rather, the condition of the science and practice of good railroading. Experience may demonstrate that rules designed to facilitate the business or to diminish danger are disappointing and unwise, for unforeseen reasons, and in such cases, as the object of the departure from ordinary practice may not give immunity, neither should the departure make a new and arbitrary standard of care, from which the railroad cannot safely depart. It is a significant fact that it has been seldom claimed that the omission to follow a rule made by the company constitutes negligence. But one case has been called to our attention—i. e., *Dublin, etc., R. Co.* v. *Slattery*, L. R. 3 App. Cas. 1163—where it has been held that it was evidence of neg-

ligence.   The question received no discussion, except the
following brief mention:

" The only negligence alleged against the appellants
was that the express train from Dublin did not whistle be-
fore or as it passed through the station, and it was sug-
gested that, had it whistled, it would have acted as a cau-
tion to Slattery, and he would not have attempted to cross
the line, and, further, that, as a person accustomed to the
ways of the station, he would expect that a train passing
through without stopping would give notice, by a whistle,
of its approach.   As to the necessity for whistling, Rossi-
ter, the engine driver, called for the appellants, stated that
it was his duty, with express trains, to whistle passing
every station; and although it would, as it seems to me,
be difficult to lay down an abstract rule as to the necessity
of whistling, it may be taken that the orders given to the
engine drivers showed that the appellants considered
whistling, under the circumstances, to be a reasonable and
proper precaution, and it might have been, and I think it
was, right to tell the jurors that, if they found this pre-
caution neglected on this occasion, they might consider it
to be evidence of negligence on the part of the appellants."

In a country like our own, where the law compels en-
gineers to sound the whistle at all rural crossings, there is
no diversity of opinion upon a failure to give the alarm.
We would perhaps feel the same regarding an omission to
follow a practice so uniform as to be generally known,
and expected by the public, though not a statutory duty;
and the question of negligence would not depend upon the
existence of the rule, so much as upon the practice, and the
right of the public or the person injured to expect its
observance.   The regulation might constitute some evi-
dence tending to show this, and that it was negligence
in the particular case to omit to follow it; but we can
think neither that the failure to observe this rule, in and
of itself alone, is per se negligence, nor that it neces-
sarily proves a practice, though it was perhaps admissible
in that case in connection with other proof upon that sub-
ject.   That is all that can be said to have been decided by
the case cited.   While the foregoing is the extent to which

the above-mentioned rule should be carried, there are doubtless many regulations of which even that could not be said. All of the details of railroad management (i. e., the running of trains) are worked out under rules, the disregard of which at times may be unavoidable. An absence of elasticity in their observance might mean disaster and death, and it would be the height of injustice to say that evidence of such disregard is evidence, per se or prima facie, of negligence; and, manifestly, of the many rules which have no direct bearing upon the question of safety, yet which may be in a way connected with the circumstances of a disaster, neither ought to be said.

Allusion has been made to the infrequency of adjudications upon this question. Proof of rules has often been introduced to prove contributory negligence through disobedience of them by employés. Manifestly such cases have no bearing upon a case like the present. There are a few, however, where attempts have been made to predicate negligence to third persons upon them. Eliminating such of these as involve a mutual knowlege of, and right to rely upon, the observance of a known and settled practice, thereby differing from the record before us, and such as are based upon the duty of a master to promulgate rules necessary for the protection of his servant, we have few left. All that we have found were considered in the case of *Fonda* v. *Railway Co.*, 71 Minn. 448, where Mitchell, J., speaking for a unanimous bench, said:

"Its rules [are] intended only for the guidance of its own employés in the operation of its cars. We think this was error. There was no evidence that the plaintiff had any knowledge of the existence of these rules, or of any custom, based upon ·them, as to the manner of operating cars; hence his conduct could not have been in any way affected or influenced by them. It is not claimed that these rules require or permit anything that is inconsistent with reasonable care. The theory upon which they were offered was that they tended to show what duty the defendant owed to the public in the operation of its cars, and hence that a violation of any of them, being a breach of

such duty, constituted actionable negligence, or at least was evidence of it. Private rules of a master regulating the conduct of his servants in the management of his own business, although designed for the protection of others, stand on an entirely different footing from statutes and municipal ordinances designed for the protection of the public. The latter, as far as they go, fix the standard of duty towards those whom they were intended to protect, and a violation of them is negligence in law or per se. But a person cannot, by the adoption of private rules, fix the standard of his duty to others. That is fixed by law, either statutory or common. Such rules may require more or they may require less than the law requires; and, whether a certain course of conduct is negligent, or the exercise of reasonable care, must be determined by the standard fixed by law, without regard to any private rules of the party. Under some circumstances, such rules may become an important factor in the application of legal principles to the conduct of a person—as, for example, where the rule was known to him, and he governed, or had a right to govern, his conduct accordingly. Such was the case of *Smithson* v. *Railway Co.*, 71 Minn. 216. In that case the rule was known to, and obligatory upon, both the party injured and the party guilty of the alleged negligent act. Each was bound to know that the other might and could regulate his own conduct on the assumption that he would obey the rule. Some of the cases cited by counsel come within this class, and hence have no application here. Others were cases of servants against their masters, in which the gist of the action was the failure of the master to perform his absolute duty to his servants to make and promulgate rules which, if observed, would give reasonable protection to his employés. These cases are equally inapplicable. Some are cases of municipal ordinances, which, for reasons already given, are not in point. There are a few cases which support plaintiff's contention, but in none of them is the question considered or discussed at any length, and in some of them no reason whatever is given for the decision. The only reason assigned in any of them why such evidence is admissible is that it is in the nature of an admission by the party promulgating the rule that reasonable care required the exercise of all the precautions therein prescribed. *Georgia Railroad* v. *Williams*, 74 Ga. 723; *Lake Shore, etc., R. Co.* v. *Ward*, 135 Ill. 511.

The fallaciousness and unfairness of any such doctrine ought to be apparent on a moment's reflection. The effect of it is that, the more cautious and careful a man is in the adoption of rules in the management of his business in order to protect others, the worse he is off, and the higher the degree of care he is bound to exercise. A person may, out of abundant caution, adopt rules requiring of his employés a much higher degree of care than the law imposes. This is a practice that ought to be encouraged, and not discouraged. But if the adoption of such a course is to be used against him as an admission, he would naturally find it to his interest not to adopt any rules at all. To treat the adoption of such rules as an admission against the party would involve the same principle as treating repairs or improvements made after an accident as an admission of prior defects—a doctrine long since repudiated by this court, and now repudiated by most of the courts of the country. *Morse* v. *Railway Co.*, 30 Minn. 465. If we could hold, as a matter of law, that these rules required nothing more than was required in the exercise of reasonable care, their admission would be error without prejudice, but an examination of them satisfies us that we cannot so hold."

Among the cases relied upon to support the plaintiff's contention in the Minnesota case is *Maxwell* v. *Eason*, 1 Stew. 514. An action was brought against a ginner of cotton to recover for cotton lost by fire. The case recognized the rule that the test of negligence was the usual custom of ginners as to carrying fire, and it was said that the defendant's custom was admissible, also, if conformable to the general usage. Manifestly this must be the limitation, or extraordinary and commendable caution will establish a rule of greater diligence for the prudent than the law does for the ordinary person. We are impressed by the reasoning of Mr. Justice Mitchell, and the soundness of the rule enunciated by him. It should not be held that, where the ordinances of a city authorize a speed of 20 miles an hour, a rule of the company requiring caution by its motormen, through a direction to slow down to 4 miles an hour in front of schoolhouses, thereby establishes that rate as the maximum limit of reasonably safe railroading.

Were it to do so, there would be much force in the possible claim that such a regulation should be extended to other places where children may be in the habit of congregating or may happen to be gathered together, and that a failure to so extend it is negligence. It does not follow from a contrary rule that a motorman may go recklessly or negligently through or past all places at the maximum speed. The law regulates this by rules which do not depend upon the existence or nonexistence of corporate regulations. It neither permits corporations to legislate away their responsibilities by rules, nor imposes discriminating liabilities upon them by reason of their efforts to lessen public danger.

I concur in the reversal of this judgment upon the ground that the negligence of the driver was not imputable to the plaintiff.

The other Justices concurred.