# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

MEYERS v RIECK

Docket No. 162094. Argued on application for leave to appeal January 12, 2022. Decided July 7, 2022.

Lesley Meyers, personal representative of the estate of Samuel Corrado, filed an action against Karen Rieck; Radi Gerbi; Shelby Nursing Center Joint Venture, doing business as Shelby Nursing Center; and others in the Macomb Circuit Court, alleging that defendants were negligent and had committed medical malpractice in treating Corrado. Corrado, the decedent, was a patient at Shelby Nursing Center, a nursing home, in 2014. Corrado had been prescribed a feeding tube due to a medical condition that made it difficult for him to swallow. On June 2, 2014, Gerbi, a nurse employed by Shelby Nursing Center, went to Corrado's room to administer the feeding tube, but after noticing that Corrado had vomited, he did not administer the feeding tube. Later, Gerbi heard Corrado calling for help, and he entered Corrado's room and found that he had vomited again. The nursing home had a standing order for patients with nausea that directed staff to, among other things, administer an antinausea medication and to notify the patient's doctor immediately if the patient had more than one episode of vomiting in a 24-hour period. Pursuant to the standing order, Gerbi administered the antinausea medication to Corrado. Gerbi also attempted to call a physician, but when he was unable to reach the physician he went on break instead. Meyers, Corrado's daughter, who had been in contact with Corrado throughout the day, called the nursing home to have someone sent to Corrado's room. When she was unsuccessful, Meyers went to the nursing home herself, where she found Corrado having difficulty breathing. Corrado was taken to the hospital, where he died from hypoxia due to aspiration. In the action, plaintiff alleged both ordinary negligence and medical malpractice. During discovery, plaintiff learned of the standing order and moved to amend the complaint to add to its ordinary-negligence claim allegations that Gerbi had failed to comply with the standing order to contact a physician after Corrado's second vomiting episode. In response, Shelby Nursing Center moved to dismiss the new claim, arguing that the standing order was not evidence of ordinary negligence, could not be used to establish the standard of care in a medical malpractice claim, and could not be admitted as evidence in support of a medical malpractice claim. The trial court, James M. Maceroni, J., granted plaintiff's motion to amend and denied Shelby Nursing Center's motion to dismiss. Shelby Nursing Center sought leave to appeal, and the Court of Appeals granted the application. The Court of Appeals, RIORDAN, P.J., and FORT HOOD and SWARTZLE, JJ., reversed in a published per curiam opinion. 333 Mich App 402 (2020). The Court of Appeals held that plaintiff's proposed amended claim sounded in medical malpractice, rather than ordinary negligence. The Court of Appeals also concluded that

the standing order could not be used to establish the standard of care for a medical malpractice claim and could not be admitted as evidence at trial. Plaintiff sought leave to appeal in the Michigan Supreme Court, and the Court ordered and heard oral argument on whether to grant plaintiff's application for leave to appeal or take other action. 507 Mich 958 (2021).

In a unanimous opinion by Justice VIVIANO, the Supreme Court, in lieu of granting leave to appeal, *held*:

Plaintiff's proposed amendment sounded in medical malpractice, and the standard of care in a medical malpractice action may not be established by the internal rules and regulations of the defendant medical provider. Those rules and regulations, however, may be admissible as evidence in determining the standard of care, provided that the jury is instructed that they do not constitute the standard of care.

1. The threshold question in this case was whether plaintiff's proposed amendments to the complaint sounded in ordinary negligence or medical malpractice. In general, medical malpractice claims arise within the course of a professional relationship and raise questions involving medical judgment rather than issues that are within the common knowledge and experience of the fact-finder. Plaintiff argued that no medical judgment was required to follow the standing order because it was mandatory and did not afford Gerbi any discretion or opportunity to exercise medical judgment. A claim that concerns the failure to monitor and assess risks to a patient usually requires specialized medical knowledge and therefore sounds in medical malpractice. On the other hand, if a nurse fails to take any action to address a known problem or hazardous condition, then the claim might sound in ordinary negligence. But plaintiff's claim did not simply allege that Gerbi failed to take any action in light of a known risk; rather, plaintiff alleged that Gerbi was negligent because he failed to take a specific action in response to the circumstances. That specific action was set forth in the standing order. To assess whether Gerbi should have notified the physician sooner, the fact-finder would need to know about the risk of acute aspiration in a patient with a feeding tube who had vomited twice and the specific steps that needed to be taken to address that risk. That assessment necessarily implicated medical judgment beyond common knowledge and experience. Therefore, the gravamen of the proposed amendments sounded in medical malpractice.

2. Generally, to prove medical malpractice, the plaintiff must establish that the defendant owed a duty to exercise that degree of skill, care, and diligence exercised by members of the same profession, practicing in the same or similar locality, in light of the present state of medical science. In this case, plaintiff contended that the standard of care applicable to Shelby Nursing Center's nursing staff was that they had to comply with the provisions of the standing order. Plaintiff's argument failed because longstanding caselaw holds that a private entity's internal rules do not fix the standard of care regarding its duty to others. This held true whether the argument was that the order established the standard of care or that the standard of care was to follow the order because in either case plaintiff sought to hold Shelby Nursing Center liable for the same underlying conduct: the breach of the actions prescribed by the order. A defendant's violation of its own rules does not constitute negligence per se, and the mere allegation that a defendant breached its own rule or regulation does not, by itself, make out a claim for negligence. Allowing a private organization's rules and regulations to establish the standard of care would permit that organization

to choose the standards under which it would be liable to others. The law neither permits private entities to legislate away their responsibilities by establishing rules, nor does it impose discriminating liabilities upon them by reason of their efforts to lessen public danger. This rule was previously applied in the context of ordinary negligence and naturally extended to medical malpractice claims.

3. Although a private entity's own rules and regulations do not establish the standard of care in a medical malpractice case, it does not follow that those rules and regulations are categorically inadmissible. In this case, the fact that the standing order did not, by itself, represent the applicable standard of care did not mean that it was altogether irrelevant in determining the standard of care. The Supreme Court has recognized in ordinary-negligence cases that an entity's internal regulations might constitute some evidence of negligence. Because there is a potential difficulty in distinguishing between the use of an internal rule or regulation as evidence of the standard of care and its use to establish the standard of care, a jury that receives this sort of evidence must be cautioned as to its proper use. Further, a medical provider's internal rules and regulations must meet general evidentiary standards, including the rules regarding relevancy, MRE 402, and probative value, MRE 403.

Judgment reversed in part and affirmed in part, and case remanded to the trial court for further proceedings.

Justice BERNSTEIN did not participate because he has a family member with an interest that could be affected by the proceeding.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED  July 7, 2022

STATE OF MICHIGAN

SUPREME COURT

LESLEY MEYERS, Personal Representative
of the ESTATE OF SAMUEL CORRADO,

      Plaintiff-Appellant,

v                                                                No. 162094

KAREN RIECK, RADI GERBI, R.N.,
JESSICA JOHNSON, L.P.N., BEAUMONT
NURSING HOME SERVICES, INC., and
PINEHURST EAST, INC.,

      Defendants,
and

SHELBY NURSING CENTER JOINT
VENTURE, doing business as SHELBY
NURSING CENTER,

      Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH (except BERNSTEIN, J.)

VIVIANO, J.

Lesley Meyers brings this action on behalf of the estate of Samuel Corrado, claiming that defendants were negligent and committed medical malpractice in their treatment of Corrado, who died while a resident at defendant Shelby Nursing Center. In the proceedings below, plaintiff moved to amend its complaint to add allegations concerning one of defendant's standing orders, which established a procedure for treatment of patients with Corrado's condition. Plaintiff's new allegations are that defendant's nurse violated the standing order and that this violation gives rise to an ordinary-negligence claim.

We hold that plaintiff's new allegations sound in medical malpractice. We further hold that the standing order cannot establish the standard of care for a medical malpractice action. Therefore, to the extent that the new allegations raise a claim based *solely* on the violation of the standing order, that claim must fail. However, to the extent that the new factual allegations concerning the standing order are relevant to any other claim in plaintiff's original complaint, the standing order may be used as evidence of the standard of care if it is otherwise admissible and the jury is instructed that the order does not itself constitute the standard of care.

## I. FACTS

Corrado suffered from dysphagia, which is a medical condition that makes it difficult to swallow. Because this condition impeded his ability to eat, Corrado's doctor ordered a feeding tube. After placement of the tube, Corrado was admitted to defendant nursing home on March 20, 2014. His recovery was progressing, and he was scheduled for discharge on June 17, 2014.

The nursing home had a standing order on the treatment of patients with nausea.[1] The order stated that if the patient has "[n]ausea with or without vomiting," staff were to:

> Check for fecal impaction. If impacted remove impaction manually and give fleets enema. If nausea and/or vomiting persist, give Tigan 100 mg suppository or 100 mg i.m. one dose only . . . . Notify physician next office day for a single episode.

> Report immediately to physician if: . . .> 1 episode within 24 hours.

On June 2, 2014, at about 5:00 p.m., defendant Radi Gerbi, a registered nurse working for Shelby Nursing Center, arrived in Corrado's room to administer medication and a feeding tube.[2] At that time, he noticed that Corrado had vomited, which Corrado confirmed. Consequently, he did not administer the medication or feeding tube but did check Corrado's vitals, monitor him for a period, and notify other nurses. About 90 minutes later, Gerbi heard Corrado calling for help. Gerbi entered Corrado's room and found him hunched over a small tub, in which Corrado had just vomited. At this point, Gerbi administered Tigan (a medication used to treat nausea and vomiting) pursuant to the

---

[1] A standing order is

> a written document containing rules, policies, procedures, regulations, and orders for the conduct of patient care in various stipulated clinical situations. The standing orders are usually formulated collectively by the professional members of a department in a hospital or other health care facility. Standing orders usually name the condition and prescribe the action to be taken in caring for the patient, including the dosage and route of administration for a drug or the schedule for the administration of a therapeutic procedure. Standing orders are commonly used in intensive care units, coronary care units, and emergency departments. [*Mosby's Medical Dictionary* (2021).]

[2] While Gerbi is a defendant in the underlying case, he is not an appellee in the present appeal.

standing order and monitored Corrado. About 20 to 30 minutes after the second vomiting episode, Gerbi called a physician pursuant to the standing order. He could not reach the physician so he notified his supervisor and then took his 30-minute break.

In the meantime, Meyers (who is Corrado's daughter) had been in contact with Corrado throughout the day. After unsuccessfully attempting to have someone sent to Corrado's room, she went to the nursing facility herself, arriving at around 6:45 p.m., after the Tigan had been administered. Meyers found Corrado violently shaking and struggling to breathe. Emergency personnel arrived in Corrado's room about ten minutes later and rushed him to the hospital, where he died from hypoxia due to aspiration.

Plaintiff brought the present lawsuit against the nursing home, Gerbi, and other defendants on behalf of Corrado's estate. The complaint contains ordinary-negligence claims and medical malpractice claims encompassing all the events that occurred and various alleged breaches of the relevant standards of care. In particular, the complaint alleged that Gerbi and other defendants failed to adequately monitor Corrado and to provide emergency care, including notifying Corrado's physician concerning his status. During discovery, plaintiff learned about the standing order and moved to amend the complaint to include allegations concerning the standing order and "to add as part of its claim for ordinary negligence the fact that Nurse Gerbi failed to comply with [the] standing order to contact the physician on call."[3] In response, defendant moved to dismiss the new claim, arguing that the standing order was not evidence of ordinary negligence and could

---

[3] The amended complaint was never filed.

4

not be used to establish the standard of care in a medical malpractice claim. Because the standing order could not be used as the standard of care, defendant also argued that it could not be admitted as evidence in support of the claim. The trial court rejected these contentions, denying defendant's motion for summary disposition and granting plaintiff's motion to amend. It held that the standing order, by its terms, did not require or involve any medical judgment—the order simply required the nurse to notify a physician. Therefore, "whether defendant failed to follow the Standing Order is a question of reasonableness and sounds in negligence, and not medical malpractice."

On appeal, the Court of Appeals reversed in a published opinion. It first held that the proposed claim sounds in medical malpractice rather than ordinary negligence because plaintiff's core contention was that Gerbi failed to take specific actions in response to Corrado's second episode of vomiting. The Court wrote, "A lay fact-finder would not know that a physician should be immediately informed when a patient vomits twice in a matter of hours and could not rely solely on common knowledge and experience to determine whether it was reasonable for Gerbi to wait at least 20 minutes before attempting to consult a doctor about Corrado's status." *Estate of Corrado v Rieck*, 333 Mich App 402, 412; 960 NW2d 218 (2020). Thus, according to the Court, because this claim involved questions outside the jury's common knowledge, it sounded in medical malpractice. Further, the Court concluded that the standing order could not be used to establish the standard of care for a medical malpractice claim and could not be used as evidence at trial. The Court therefore reversed the trial court's denial of defendant's motion for summary disposition and remanded for further proceedings.

5

Plaintiff sought leave to appeal in our Court, and we ordered argument on the application, requiring briefing on "(1) whether the proposed claim based on a violation of the standing order sounds in medical malpractice or ordinary negligence; and (2) whether evidence of the standing order is admissible at trial." *Meyers v Rieck*, 507 Mich 958 (2021).

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

## III. ANALYSIS

In this case, we review the trial court's denial of summary disposition to defendant on the basis that plaintiff's amended allegations sufficiently raise a claim of ordinary negligence regarding the violation of the standing order. Two issues have arisen below: (1) whether plaintiff's new claim sounds in ordinary negligence or medical malpractice and can succeed when it alleges a bare violation of the standing order; and (2) whether a private entity's internal rules or regulations, like the standing order here, may be admissible evidence.

### A. NATURE OF THE CLAIM AND THE STANDARD OF CARE

The threshold question addressed by the Court of Appeals and in the parties' briefing here is whether plaintiff's amendments sound in ordinary negligence or medical malpractice. In general, a medical malpractice claim is one "brought against someone who, or an entity that, is capable of malpractice," involving actions that occurred "within the course of a professional relationship," and which "raise questions involving medical judgment" rather than "issues that are within the common knowledge and experience of

6

the [fact-finder]." *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 420, 422; 684 NW2d 864 (2004) (quotation marks and citations omitted). In the present case, the parties dispute whether the new allegations involve medical judgment. Plaintiff contends that no medical judgment was required to follow the standing order—the order, according to plaintiff, was mandatory and left Gerbi no discretion or opportunity to exercise medical judgment.

To determine the nature of the claim, we seek its "gravamen," and therefore "we disregard the labels given to the claim[] and instead read the complaint as a whole . . . ." *Trowell v Providence Hosp & Med Ctrs, Inc*, 502 Mich 509, 519; 918 NW2d 645 (2018). The question here, then, is whether the substance of the new claim relates to matters involving medical judgment outside "the common knowledge and experience of the [fact-finder]." *Bryant*, 471 Mich at 424 (quotations marks and citation omitted). We agree with the Court of Appeals that the new claim involves medical judgment and therefore sounds in medical malpractice. As the Court of Appeals explained, our decision in *Bryant* indicates that if a nurse fails to take any action to address a known problem or hazardous condition, then the claim might sound in ordinary negligence. *Id*. at 431 ("If a party alleges in a lawsuit that the nursing home was negligent in allowing the decedent to take a bath under conditions known to be hazardous, . . . the claim sounds in ordinary negligence. No expert testimony is necessary to show that the defendant acted negligently by failing to take any corrective action after learning of the problem."). But a claim that concerns the failure to monitor and assess risks to a patient—such as, in *Bryant*, "the risk of positional asphyxiation posed by bed railings"—usually requires specialized medical knowledge and therefore sounds in medical malpractice. *Id*. at 426-427.

7

The present claim, that Gerbi violated the standing order, does not simply allege that Gerbi failed to take any action in light of a known risk. "Rather," as the Court of Appeals explained, "plaintiff alleges that Gerbi was negligent because he failed to take a specific action in response to the circumstances." *Estate of Corrado*, 333 Mich App at 412. That specific action was spelled out in the standing order. In this Court, plaintiff expressly "concedes that the *formulation* of Shelby [Nursing] Center's standing orders involves just the kind of medical judgment that gives rise to a claim of medical malpractice . . . ." No doubt this is because, as the Court of Appeals stated, "[a] lay fact-finder would not know that a physician should be immediately informed when a patient vomits twice in a matter of hours and could not rely solely on common knowledge and experience to determine whether it was reasonable for Gerbi to wait at least 20 minutes before attempting to consult a doctor about Corrado's status." *Estate of Corrado*, 333 Mich App at 412. In other words, to assess whether the physician should have been notified sooner, the fact-finder would need to know about the risk of acute aspiration in a patient with a feeding tube who has vomited twice and the specific steps that must be taken to address that risk. That assessment necessarily implicates medical judgment beyond common knowledge and experience. Therefore, the gravamen of the claim sounds in medical malpractice.

Plaintiff attempts to avoid this conclusion by focusing narrowly on the violation of the standing order and not the conduct prescribed by the order. But by attempting to premise liability on the bare violation of a private defendant's internal rules or regulations, plaintiff undercuts its claim completely. This is because, as explained below, such rules and regulations cannot by themselves establish the standard of care. We have applied this

8

rule in the context of ordinary negligence, and today we find that those holdings naturally extend to medical malpractice actions like the present claim.

The standard of care is a concept applicable to both ordinary negligence and medical malpractice claims. To prove ordinary negligence, a plaintiff must demonstrate, among other things, that the defendant owed the plaintiff a duty. *Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997). Once the duty is established, the "factfinder [then] determine[s] whether, in light of the particular facts of the case, there was a breach of the duty." *Id*. In that analysis, the fact-finder "determines what constitutes reasonable care under the circumstances." *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 500; 418 NW2d 381 (1988). Under a medical malpractice theory of liability, the defendant owes a "duty to exercise that degree of skill, care and diligence exercised by members of the same profession, practicing in the same or similar locality, in light of the present state of medical science." *Bryant*, 471 Mich at 424 (quotation marks and citation omitted). For nurses like Gerbi, then, the standard of care is "the degree of skill and care ordinarily possessed and exercised by practitioners of the profession in similar localities." *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 20-21; 651 NW2d 356 (2002).

Sometimes, however, the applicable standard of care is supplied by a statute or legal regulation. See, e.g., *Holmes v Merson*, 285 Mich 136, 139; 280 NW 139 (1938) ("The generally accepted view is that violation of a statutory duty constitutes negligence *per se*."); Restatement Torts, 2d, § 285, p 20 ("The standard of conduct of a reasonable man may be . . . established by a legislative enactment or administrative regulation which so provides[.]"). In such cases, the statute "establishes the standard of care" and "its breach establishes the first two elements of negligence: duty and breach of duty." 1 Modern Tort

9

Law: Liability and Litigation (May 2022 update), § 3:79. The violation of such a statute thus establishes negligence per se, i.e., that the defendant acted negligently. See *Westover v Grand Rapids R Co*, 180 Mich 373, 378; 147 NW 630 (1914) (noting that "a violation of a statute imposed under the police power of the State is negligence *per se*.").[4]

In the present case, plaintiff protests that she is *not* asking the Court to treat defendant's standing order as a statute establishing the standard of care, the violation of which constitutes negligence per se. Rather, she contends that "the standard of care applicable to the defendant's nursing staff is that the provisions of the standing order (whatever they might be) must be complied with." (Emphasis omitted.) But we see no meaningful distinction between the contention that the standing order establishes the standard of care and the argument that the standard of care is to follow the standing order. In both cases, the underlying conduct for which plaintiff seeks to hold defendant liable is the same: the breach of the actions prescribed by the order itself.

Under our longstanding caselaw, plaintiff's argument must fail. We long ago held that a private entity's internal rules do not "fix the standard of [its] duty to others." *McKernan v Detroit Citizens' Street-R Co*, 138 Mich 519, 530; 101 NW 812 (1904). That standard "is fixed by law, either statutory or common." *Id*. In other words, a defendant's violation of its own internal rule, even if the rule is designed to protect the public, does not constitute negligence per se. *Id*. at 528. As such, the mere allegation that a defendant

---

[4] We have held, however, that "violation of a safety or penal statute creates a rebuttable presumption of negligence" rather than establishing negligence per se. *Klinke v Mitsubishi Motors Corp*, 458 Mich 582, 592; 581 NW2d 272 (1998).

10

breached its own internal rule or regulation does not, without more, make out a claim for negligence. *Id*. at 530. We have followed this rule in multiple cases. See, e.g., *Baker v Mich Central R Co*, 169 Mich 609, 637; 135 NW 937 (1912) (stating that private rules "do not fix the obligations and liabilities of the master to its servants, nor to third persons and the public, those obligations, being fixed by law, cannot be diminished by such rules, nor, ordinarily, increased thereby"); *Dixon v Grand Trunk Western R Co*, 155 Mich 169, 173-174; 118 NW 946 (1908) (applying *McKernan* and holding that negligence could not be predicated on the failure to enforce a private rule).[5]

There are good reasons for this rule. Allowing a private organization's rules and regulations to establish the standard of care would permit that organization to choose the standards under which it would be liable to others. Choosing this course would "send a signal to [medical providers] that they have a safe harbor from lawsuits if they comply with [standing medical orders] to the letter, whatever the consequences for the patient." *Fagocki v Algonquin/Lake-in-the-Hills Fire Protection Dist*, 496 F3d 623, 630 (CA 7, 2007). If the order here, for example, had instructed the nurses to wait a day after the second episode of

---

[5] Other courts have held likewise. See *Wal-Mart Stores, Inc v Wright*, 774 NE2d 891, 894 (Ind, 2002) (collecting sources and noting that "[t]he law has long recognized that failure to follow a party's precautionary steps or procedures is not necessarily failure to exercise ordinary care"); *Cooper v Eagle River Mem Hosp, Inc*, 270 F3d 456, 462 (CA 7, 2001) ("As a general rule in Wisconsin, the internal procedures of a private organization do not set the standard of care applicable in negligence cases."); 57A Am Jur 2d, Negligence (2004), § 174, p 248 ("The failure to comply with a company rule does not constitute negligence per se; the jury may consider the rule, but the policy does not set forth a standard of conduct that establishes what the law requires of a reasonable person under the circumstances.").

vomiting before contacting the physician, we would be reluctant to hold that a nurse followed the requisite standard of care simply by complying with such a slack order.

Plaintiff's view might also discourage entities from adopting internal rules that require a "higher degree of care than the law imposes. . . . [I]f the adoption of such a course is to be used against him as an admission, he would naturally find it to his interest not to adopt any rules at all." *McKernan*, 138 Mich at 531; see also *Buczkowski v McKay*, 441 Mich 96, 99 n 1; 490 NW2d 330 (1992) ("Imposition of a legal duty on a retailer on the basis of its internal policies is actually contrary to public policy. Such a rule would encourage retailers to abandon all policies enacted for the protection of others in an effort to avoid future liability."). In short, the law "neither permits corporations to legislate away their responsibilities by rules, nor imposes discriminating liabilities upon them by reason of their efforts to lessen public danger." *McKernan*, 138 Mich at 532.

Although we have never addressed whether a private entity's standing orders can fix the standard of care in a medical malpractice action, the Court of Appeals has. Following our caselaw discussed above, the Court of Appeals has held that a hospital's internal rules and regulations do not establish the standard of care in malpractice actions. See *Jilek v Stockson*, 289 Mich App 291, 306-309; 796 NW2d 267 (2010) (*Jilek I*), rev'd on other grounds by 490 Mich 961 (2011) (*Jilek II*); *Gallagher v Detroit-Macomb Hosp Ass'n*, 171 Mich App 761, 764-768; 431 NW2d 90 (1988); *Wilson v WA Foote Mem Hosp*, 91 Mich App 90, 95; 284 NW2d 126 (1979). As the Court of Appeals has stated, "the ultimate question is what responsibility has the hospital assumed regarding the care of the patient. In Michigan, we look to the standard practiced in the community [or similar

12

communities] rather than internal rules and regulations to determine that responsibility in a malpractice action." *Gallagher*, 171 Mich App at 768.

The Court of Appeals' conclusion appears to reflect the nearly uniform treatment of this issue across jurisdictions.[6] The Illinois Supreme Court, in one of the leading cases on the issue, wrote that an internal hospital rule or regulation cannot be "conclusive" of the standard of care because " 'a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages.' "

---

[6] See, e.g., *Quijano v United States*, 325 F3d 564, 568 (CA 5, 2003) ("In Texas, . . . hospital rules alone do not determine the governing standard of care."); *Damgaard v Avera Health*, 108 F Supp 3d 689, 698-699 (D Minn, 2015) ("[I]t is not enough for a plaintiff simply to point to a healthcare provider's policies and claim they were breached. This conclusion, of course, flows from the fact a plaintiff asserting medical negligence must establish a physician breached the standard of care *in the relevant medical community*—not just at her hospital."); *Hodge v UMC of Puerto Rico, Inc*, 933 F Supp 145, 148 (D Puerto Rico, 1996) ("Courts in the United States have almost universally held that hospital rules, regulations, and policies alone do not establish the standard of medical care in the medical community . . . ."); *Reed v Granbury Hosp Corp*, 117 SW3d 404, 414 (Tex App, 2003) ("[A] hospital's internal policies and procedures do not, alone, determine the standard of care . . . ."); *Moyer v Reynolds*, 780 So 2d 205, 208 (Fla App, 2001) (noting that evidence of breach of an internal rule "does not conclusively establish the standard of care"); *Van Steensburg v Lawrence & Mem Hosps*, 194 Conn 500, 506; 481 A2d 750 (1984) ("In this regard, we point out that hospital rules, regulations and policies do not themselves establish the standard of care."); *Foley v Bishop Clarkson Mem Hosp*, 185 Neb 89, 93; 173 NW2d 881 (1970) (recognizing the general rule that internal regulations "do[] not establish community standards which may be either more liberal or stricter than the standards set up by defendant" and that such regulations, "[a]lthough pertinent, . . . standing alone [are] insufficient"); 41 CJS, Hospitals (2014), § 36, pp 368-369 ("Hospital rules, regulations, and policies do not themselves establish the standard of care owed a patient or reflect the community standard of medical care.") (footnotes omitted); cf. *Fisk v McDonald*, 167 Idaho 870, 881-882; 477 P3d 924 (2020) (holding that a hospital's internal policies were insufficient, alone, to provide a foundation for an out-of-area expert's testimony on the community standard of care).

13

*Darling v Charleston Community Mem Hosp*, 33 Ill 2d 326, 331-332; 211 NE2d 253 (1965), quoting *The TJ Hooper*, 60 F2d 737, 740 (CA 2, 1932). Similarly, as with our cases above in the context of ordinary negligence, other courts have observed that a contrary rule would discourage hospitals from establishing higher standards of care than the community. See *Wuest v McKennan Hosp*, 619 NW2d 682, 689; 2000 SD 151 (2000) ("Public policy encouraging standards higher than generally employed in the community dictates that individual hospital policies are not determinative of the standard of care."); see also 3 Modern Tort Law: Liability and Litigation (May 2022 update), § 24:155 ("Frequently such bylaws, in attempting to administer an efficient operation, will require higher standards than the community will customarily require.").[7]

---

[7] Some cases appear to go the other way, but they are distinguishable. For example, in *Estate of French v Stratford House*, 333 SW3d 546, 559 (Tenn, 2011), abrogated by statute as recognized in *Ellithorpe v Weismark*, 479 SW3d 818, 820 (Tenn, 2015), the Tennessee Supreme Court held that "allegations that the [certified nursing assistants] failed to comply with the care plan's instructions due to a lack of training, understaffing, or other causes, constitute claims of ordinary, common law negligence." *French*, 333 SW3d at 559. The rationale was not, however, that the bare violation of the plan was a matter of negligence. Rather, the court rested its decision largely on the distinct proposition that the violation of the care plan involved conduct that would not fall within the normal scope of medical malpractice because the services provided were "routine and nonmedical in nature . . . ." *Id*. at 560. Regardless, it does not appear that the parties argued—and the court did not directly analyze—whether internal rules and regulations could, without more, give rise to liability. Similarly, in *Lucy Webb Hayes Nat'l Training Sch for Deaconesses and Missionaries v Perotti*, 136 US App DC 122; 419 F2d 704 (1969), the court generally focused on a violation of a municipal regulation. While it did say that the jury could find negligence on the basis of, among other things, the internal hospital directives, those directives were only one piece of evidence from which the jury could find for plaintiff. *Id*., 419 F2d at 710. The court did not suggest that the bare violation of the directive was enough.

14

Accordingly, a claim that defendant committed malpractice merely by violating its own internal rule or regulation, without more, must fail because that rule or regulation does not establish the applicable standard of care. In the present case, the medical malpractice claim that plaintiff seeks to add to the complaint is premised solely on Gerbi's violation of the standing order.[8] Therefore, the Court of Appeals properly reversed the trial court's denial of defendant's motion for summary disposition of the proposed new claim.

## B. ADMISSIBILITY OF INTERNAL RULES AND REGULATIONS

The Court of Appeals went further, however, holding that because the standing order does not establish the standard of care, it was irrelevant to the case and therefore inadmissible for any purpose.[9] This conclusion was ultimately based on this Court's order in *Jilek II*, 490 Mich 961. We take this opportunity to correct the misapprehension that a private entity's internal rules and regulations are categorically inadmissible.

---

[8] As mentioned above, plaintiff never filed the actual amended complaint. But, as noted, plaintiff has explained at length that the new claim is premised only on the breach of the standing order. Indeed, the limited nature of the claim is at the center of plaintiff's argument that the claim sounds in ordinary negligence because the standing order was mandatory. For the reasons already discussed, the mandatory nature of the order is irrelevant because the order cannot itself establish the standard of care.

[9] The admissibility question arises even if the new claim is dismissed because the new factual allegations plaintiff has sought to add concerning the standing order might also be relevant to plaintiff's existing claims. For instance, the original complaint alleges that Gerbi and various defendants failed to adequately monitor Corrado and provide appropriate emergency care, including notifying Corrado's physician and calling for assistance. Thus, regardless of whether the new claim is dismissed, the factual allegations concerning the standing order may be relevant to the existing claims.

15

In *Gallagher*, the Court of Appeals noted that while hospital rules and regulations could not establish the standard of care, they "could be admissible as reflecting the community's standard where they were adopted by the relevant medical staff and where there is a causal relationship between the violation of the rule and the injury." *Gallagher*, 171 Mich App at 767. But the hospital rules were not indicative of the standard of care in *Gallagher* because they "were more in the nature of . . . administrative guidelines" and, therefore, were inadmissible. *Id*. at 768.

In *Jilek I*, the Court of Appeals relied on *Gallagher*'s discussion of admissibility. *Jilek I*, 289 Mich App at 306-307, 314. The Court also cited numerous out-of-state decisions, stating that "[n]early all of the states that have published law on the subject appear to follow the rule that internal policies may be introduced as relevant to the standard of care but, standing alone, do not fix or establish that standard." *Id*. at 309-310. The dissent in *Jilek I* criticized the majority for its reliance on *Gallagher*, characterizing the earlier decision's comments on admissibility as dicta. *Id*. at 316 (BANDSTRA, J., dissenting). The thrust of the dissent, however, was that the majority had ignored the standard of review applicable to the trial court's evidentiary rulings excluding the internal hospital rules. *Id*. at 317. We reversed the Court of Appeals majority in an order mostly addressing other matters. *Jilek II*, 490 Mich at 961. In relevant part, we stated, "We also conclude that the trial court did not abuse its discretion in excluding plaintiff's proposed document exhibits at issue for the reasons stated in the analysis of the Court of Appeals dissenting opinion." *Id*.

The resolution in *Jilek II* thus left this issue in an unsettled state. Reading our order in *Jilek II* broadly, the Court of Appeals below held that internal rules and regulations are

16

simply inadmissible. But the Court's reasoning displays the flaws in such an approach. In holding that the amended claim sounds in medical malpractice, the Court of Appeals concluded that the standing order involves medical judgment about the treatment necessary for a patient in Corrado's condition. But in declaring the standing order to be inadmissible, the Court of Appeals indicates that the standing order is irrelevant to determining the medical standard of care regarding the medical treatment necessary for an individual in Corrado's condition. It makes little sense to say that the standing order (or the actions it prescribes) involves medical judgment about the proper treatment but also has no bearing on what constitutes the proper treatment.

The fact that the standing order cannot itself represent the applicable standard of care does not mean that it is altogether irrelevant to determining the standard of care or whether it was breached. We indicated as much in *McKernan* when we recognized that the railroad's internal "regulation might constitute some evidence" concerning negligence. *McKernan*, 138 Mich at 528; see also *Van Steensburg*, 194 Conn at 506 ("The failure to follow such rules and regulations is . . . evidence of negligence."). The same rule is supported by the overwhelming weight of authority in the context of medical malpractice: a medical provider's rules and regulations can be used as evidence to help determine the standard of care, but they cannot be used as the standard itself without additional evidence. See, e.g., *Quijano*, 325 F3d at 568 ("In Texas, a hospital's internal policies and bylaws may be evidence of the standard of care, but hospital rules alone do not determine the governing standard of care."); see also *Darling*, 33 Ill 2d at 332 (allowing internal hospital regulations to be admitted into evidence); *Jilek I*, 289 Mich App at 309-310 (collecting cases). This is true even in states, like ours, that generally require expert testimony to establish the

17

standard of care. See, e.g., *Dine v Williams*, 830 SW2d 453, 456-457 (Mo App, 1992) (explaining that, "[i]f plaintiffs' expert had testified to the standard of care of an attending physician and that the defendants' conduct fell below that standard, then the rules and regulations may have been admissible to support the negligent conduct" in the medical malpractice action despite the fact that expert testimony is necessary to establish the standard of care); see also *Woodard v Custer*, 473 Mich 1, 6; 702 NW2d 522 (2005) ("Generally, expert testimony is required in medical malpractice cases.").

But courts must be cautious in admitting this evidence. One court explained the need for caution in the context of ordinary-negligence claims:

> Indeed, this court has held that a party's internal policies and procedure are admissible as some evidence of the appropriate standard of care. . . . However, as Professor Wigmore has noted, a difficulty
>
> > "arises from the necessity of distinguishing between the use of such facts *evidentially* and their use as involving a *standard of conduct* in substantive law . . . . To take [the defendant's] conduct as furnishing a sufficient legal standard of negligence would be to abandon the standard set by the substantive law, and would be improper . . . . The proper method is to receive it, with an express caution that it is merely evidential and is not to serve as a legal standard."
> >
> > 2 J Wigmore, *Evidence* § 461, at 593 (footnote omitted, emphasis in original).
>
> Consistent with the Wigmore analysis, this court has held that the jury receiving such evidence must be cautioned that the existence of an internal rule does not itself fix the standard of care. [*Steinberg v Lomenick*, 531 So 2d 199, 200 (Fla App, 1988) (alteration in *Steinberg*).]

We agree with these concerns and believe that any jury receiving such evidence must be instructed as to its proper use. In addition, we emphasize that a medical provider's internal rules and regulations, like the standing order, must meet general evidentiary standards,

18

including that the evidence be relevant, MRE 402, and its probative value must not be outweighed by the concerns listed in MRE 403. A particular rule or regulation, of course, might be irrelevant to the question at hand in a given case. But we hold today that internal rules and regulations are not categorically inadmissible as irrelevant.

Given this analysis, the Court of Appeals erred to the extent it held that the standing order was inadmissible in this case because all such orders are irrelevant to the standard of care.[10]

## IV. CONCLUSION

For the reasons above, we hold that plaintiff's amended claim concerning the violation of the standing order sounds in medical malpractice. The claim is premised on the bare violation of the standing order. But because the standing order does not establish the standard of care applicable to the case, the new claim must fail. However, this conclusion does not mean the standing order is irrelevant in determining the standard of care with regard to any other claims in the original complaint. A private entity's internal rules or regulations, like the standing order, are not inadmissible simply because they do not alone establish the standard of care. If they meet the rules governing the admission of evidence and if the jury is instructed as to their proper use—i.e., that they are evidence of the standard of care and do not fix the standard itself—then they might be admitted. In light of these holdings, we reverse the Court of Appeals in part but affirm its judgment reversing the trial court's denial of defendant's motion for summary disposition with regard

---

[10] We do not decide here whether the particular standing order at issue meets the applicable criteria for admission.

19

to the new allegations concerning the standing order.  We remand to the trial court for proceedings not inconsistent with this opinion.

David F. Viviano
Bridget M. McCormack
Brian K. Zahra
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch


BERNSTEIN, J. did not participate because he has a family member with an interest that could be affected by the proceeding.

20